**Donte J. KIDD, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 04–CF–1255.**

District of Columbia Court of Appeals.

Argued Oct. 24, 2007.

Decided Nov. 29, 2007.

Judith A. Lovelace, appointed by the court, for appellant.

Jay Apperson, Assistant United States Attorney, and Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, Douglas K. Klein, and Elizabeth Gabriel, Assistant United States Attorneys, were on the brief, for appellee.

Before REID, BLACKBURNE–RIGSBY, and THOMPSON, Associate Judges.

REID, Associate Judge:

Appellant, Donte J. Kidd, challenges his conviction on the charge of first-degree premeditated murder while armed.[1] He mainly contends that the trial court's erroneous aiding and abetting jury instruction violated his constitutional due process right, because under our decision in *Wilson–Bey v. United States*, 903 A.2d 818 (D.C.2006) (en banc),[2] and other cases, the trial court failed to properly instruct the jury on the *mens rea* element of the mur-

---

1. D.C.Code §§ 22–2101, –4502 (2001). He also was convicted of possession of a firearm during a crime of violence, in violation of D.C.Code § 22–4504(b).

2. In *Wilson–Bey*, we considered a longstanding jury instruction—"[a]n aider and abettor is legally responsible for the natural and probable consequences of the crime in which [h]e intentionally participates." 903 A.2d at 821.

We declared that instruction constitutionally erroneous, and held that "in any prosecution for premeditated murder, whether the defendant is charged as a principal or as an aider or abettor, the government must prove all of the elements of the offense, including premeditation, deliberation, and intent to kill." *Id.* at 822.

der charge; that is, the government must prove premeditation, deliberation, and the specific intent to kill in an aiding and abetting case. He further argues that the trial court's error constituted a structural defect requiring reversal of his conviction because the error was not harmless beyond a reasonable doubt. We hold that although the trial court's aiding and abetting jury instruction was clearly constitutionally erroneous under *Wilson–Bey*,[3] the error was not structural; and since Mr. Kidd did not object to the instruction, the plain error standard of review applies. We affirm the judgment of the trial court.

## FACTUAL SUMMARY

The government presented evidence showing that on June 29, 2002, around 3:30 a.m., DeWayne Weaver was shot and killed in the 1400 block of Canal Street, in the Southwest quadrant of the District, near P Street and Fort McNair. Three eyewitnesses gave testimony at trial in behalf of the government. Rebecca Lindsay, who resided in the area of the shooting, was playing in the courtyard of the Canal Street apartment complexes[4] with her younger brother, Robert Lindsay. As the siblings bounced a basketball back and forth, the ball at one time veered toward Mr. Weaver. Mr. Weaver retrieved the basketball, returned it to Robert, and walked toward a clothesline pole. When Mr. Weaver was approximately twenty feet away from Ms. Lindsay, she saw Mr. Kidd emerge from a "cut" or alleyway. She knew Mr. Kidd because she had dated his brother. Nothing obstructed Ms. Lindsay's view. As Mr. Kidd emerged from the cut, he had a black gun in his hand. Mr. Weaver held his hands out and

said, "What? You can't take a as* whipping?" Ms. Lindsay also saw a second man come out of the alleyway with a gun. Mr. Kidd stood on one side of Mr. Weaver and the second man on the other side; Mr. Kidd pointed his gun to Mr. Weaver's side. Ms. Lindsay watched as a third man arrived with a gun and walking fast, stood behind Mr. Weaver, pointed the gun close to the back of his head and shot him. Ms. Lindsay heard two shots. Mr. Weaver fell to the ground; the shooter ran away. Ms. Lindsay "hesitated," and ran into an apartment building (1414), but she went out again to get her brother. They went into the building. Ms. Lindsay heard several more shots, and after a "couple of seconds," she went outside again. She noticed that Mr. Weaver was dead, and that another person (Irving Winslow) had been shot, but she did not see that shooting. Because of her fear, Ms. Lindsay did not speak to the police until July 6, 2002, but she did tell Alicia Hawkins and Sharice Foxx on June 29, 2002, that she saw the shooting. She also reported to them that Mr. Kidd was at the scene of the shooting and had a gun. While speaking with the police on July 6, Ms. Lindsay identified Mr. Kidd as one of the individuals who pointed a gun at Mr. Weaver.

Robert Lindsay testified that Mr. Kidd was a friend, and that he knew Mr. Weaver through Mr. Weaver's brother. Mr. Weaver and Mr. Kidd did not get along. He had seen them fight and argue. On June 29, around 3:30 a.m., he was playing basketball with his sister, shooting the ball against the numbers on the apartment building. After Mr. Weaver returned the basketball to him when he lost control of it, Mr. Lindsay saw him walk over to a

---

**3.** Since Mr. Kidd's trial occurred in June 2004, the trial judge did not have the benefit of our *Wilson–Bey* decision.

**4.** Apartment buildings close to the murder scene were located at 1414 and 1420 Canal Street; the courtyard was in front of 1414 and along the side of 1420.

clothesline pole, and observed Mr. Kidd and someone else walk toward him. Mr. Kidd had a gun which he pointed toward Mr. Weaver's "lower stomach." The second person held a gun to Mr. Weaver's head. Mr. Weaver "mentioned something earlier about a fight," saying: "You can't take an as* whipping." Mr. Weaver did not have a gun in his hand. A third man "came out of the cut, [and] shot Mr. Weaver in the back of his head." Mr. Weaver "went limp." Mr. Lindsay was about fifteen feet away and had an unobstructed view of the shooting. His sister ran into the apartment building, but he "[s]tood there because [he] was shocked." Mr. Kidd and the second man ran. "The third individual picked up some silver things off the ground," and ran. Mr. Lindsay heard "multiple" shots as the perpetrators ran away. His sister came back, "grabbed" him, and they returned to the apartment. When he emerged from the apartment building, he saw Mr. Weaver on the ground. He also observed that Mr. Winslow had been shot in the leg. Mr. Lindsay did not speak with the police on June 29, 2002, but he spoke with a detective on February 13, 2003. He identified Mr. Kidd as one of the persons who held a gun to Mr. Weaver.

At the time of the shooting, Alicia Hawkins, who also lived in the neighborhood, was drinking beer with her friend Sharice Foxx, Irving Winslow, and others on the porch at the 1420 apartment building. She had consumed about four beers. When she left the porch to return to her apartment, located in the 1414 building, she saw Mr. Kidd and another man around Mr. Weaver. She noticed that Rebecca and Robert Lindsay also were in the courtyard. Ms. Hawkins knew Mr. Kidd and had been "intimate' with him 'a few times.' She also knew Mr. Weaver and the Lindsays. Mr. Kidd had 'his arm out," but she could not see what was in his hand. Another man

"[c]ame from 'round the corner, stuck his arm out, and [Mr.] Weaver fell.'" The man's arm had been pointing "from [Mr. Weaver's] head to [his] neck,' and Ms. Hawkins had heard 'about two' shots. Mr. Kidd and the other men 'took off' after Mr. Weaver fell. Ms. Hawkins went back toward the porch on which she had been sitting and went into the building. She heard more shots, around two or three. Seconds later, she left the building and went to Mr. Weaver to see 'where he had been shot at.' She held his hand and was crying; there was no response from him. Soon she heard Irving Winslow 'screaming' and walked across the street. Mr. Winslow had been shot '[i]n the legs.'" Ms. Hawkins went into the 1414 building and saw Rebecca and Robert Lindsay. Rebecca described what she had witnessed.

The prosecutor brought out on direct examination of Ms. Hawkins that she had lied to certain law enforcement officials about details she had not seen. Because she was "angry and upset," Ms. Hawkins went to Fort McNair and told a police officer that "Donte [Kidd] and his friends shot [Mr.] Weaver and shot [Mr.] Winslow." Although she did not see a gun in Mr. Kidd's hand, Ms. Hawkins reported that he had a gun when Mr. Weaver was shot, and she lied to the police about seeing Mr. Winslow shot. When Ms. Hawkins spoke with a police detective later that evening, she also lied about seeing both Mr. Kidd and the shooter with a gun. She said she was upset and repeated details mentioned by Ms. Lindsay. When defense investigators interviewed her, Ms. Hawkins said Mr. Kidd was dead, which was not true. However, Ms. Hawkins stated when she appeared before the grand jury, she only recounted what she actually had seen.

Sharice Foxx, who lived in the Southwest neighborhood, was drinking beer (and also a small cup of Hennessy) and sitting on the porch of the 1420 apartment building with Ms. Hawkins, Mr. Winslow, and others on the early morning of Mr. Weaver's murder. Ms. Foxx's best friend was Mr. Weaver's brother. She confirmed that Ms. Hawkins had left the porch that morning to go to the bathroom. Mr. Winslow received a telephone call and left the porch. As she was walking through the courtyard, Ms. Foxx heard two shots, followed by a "pause." She was "stunned." Ms. Hawkins returned and "pulled" her into the 1420 building. Ms. Foxx ran to the second floor and got down on the ground. She heard five more shots, but did not see the shooting. After the shots stopped, she looked out of the window and saw Mr. Winslow on the ground. When she heard Ms. Hawkins scream, "They shot Weaver," she went outside and over to Weaver who was on the ground, on his back, with blood coming from his head. She took his hand and asked him to squeeze her hand, but there was no response. She spoke with Rebecca Lindsay a little bit later, and Ms. Lindsay described what she had seen. Ms. Foxx recounted the details in court that Ms. Lindsay had given her.

Dr. Gertrude Juste, a District of Columbia medical examiner, performed an autopsy on Mr. Weaver's body. She explained that he died from "a gunshot wound to the head which perforated [his] brain." The wound was located "at the base of [his] skull." She recovered several bullet fragments from his head.

Detective Jeffrey Owens of the Metropolitan Police Department ("MPD"), the lead investigator assigned to Mr. Weaver's murder, informed the jury that he located three witnesses to the shooting—Rebecca and Robert Lindsay and Ms. Hawkins. All three implicated Mr. Kidd as involved in the shooting. In addition to investigating Mr. Weaver's murder, Detective Owens was assigned to the shooting of Mr. Winslow. He interviewed Mr. Winslow's mother, who said Carlton Edwards shot her son. Detective Owens was unable to link Mr. Edwards to Mr. Winslow's shooting; Mr. Winslow refused to cooperate with the investigation. Detective Owens arrested Mr. Kidd in Southeast Washington on July 16, 2002, and spoke with him.[5] Mr. Kidd maintained that he was home in bed at the time of the Weaver shooting. But, he stated that he and Mr. Weaver had been "beefing" because Mr. Weaver had shot paint balls all over his blue Impala automobile. Detective Owens, MPD Investigator Kevin McConnell, and MPD Officer Dwayne Mitchell were part of a team which executed a search warrant at Mr. Kidd's Naylor Road Southeast residence on July 16, 2002. Investigator McConnell discovered a Brinks' home security black metal box in a trash can in the kitchen. The name "Tay" [Mr. Kidd's nickname] was "scraped into the top [of the box]." Officer Mitchell opened the black box and found inside Mr. Kidd's social security and health cards, a District of Columbia identification card bearing Mr. Kidd's name, and a loaded semiautomatic .45 caliber Colt pistol.[6]

---

5. Detective Owens was unable to identify the two men who were with Mr. Kidd at the time of the Weaver shooting.

6. Two other government witnesses testified. Officer David Murray of the MPD forensic science division or mobile crime lab examined the crime scene and recovered evidence from that scene, including bullets and fragments. Officer Michael Mulderig, also from the MPD forensic science division, testified as a firearms expert, indicating that most of the ballistics evidence was so damaged that conclusions could not be drawn. However, the

At the time of Mr. Weaver's murder, defense witness, Sergeant Anthony Weeda, was a military policeman stationed at Fort McNair, on guard in the guard's shack at the P Street gate.[7] He heard gunfire and screaming coming from apartments at P and Canal Streets on the early morning of June 29, 2002. He noticed a "[l]ot of people ... exiting, running from the courtyard screaming"; and one individual was "kind of running backwards," but he was unable to see the individual's face. He saw "muzzle flashes [from the barrel of a gun] pointing into [the] courtyard along with the gunfire." Sergeant Weeda crouched down, but soon got up and went to the corner of P Street and Canal. There, he saw the same individual he had observed running backwards. The man was "running down Canal Street towards M Street," but Sergeant Weeda did not see a gun or the person's face. When he crouched down in front of a car, he heard "some ladies crying" and saw Mr. Winslow on the ground.

Primarily through the testimony of Mr. Winslow's mother, the defense sought to show that Mr. Kidd was not involved in the shooting of Mr. Winslow. Mr. Winslow's mother was awakened in the early morning on June 29, 2002, by the sound of gunfire—two shots. After hearing more shots, she went to the window of her bedroom. She saw a man whom she had known for several years, Carlton, shoot her son three times in the leg. She informed the police. She did not see the shooting of Mr. Weaver.

The case was submitted to the jury on June 29, 2004. And, on June 30, 2004, the jury returned guilty verdicts on the charges of first-degree murder while

armed and possession of a firearm during a crime of violence.

## ANALYSIS

■ Mr. Kidd contends that the trial court's aiding and abetting instruction to the jury concerning the *mens rea* requirement of the charged crime was constitutional error under our decisions in *Wilson–Bey, supra,* and *Kitt v. United States,* 904 A.2d 348 (D.C.2006). He insists that, despite his failure to object to the instruction at trial, the trial court's error constituted a structural defect which pervaded the entire criminal process (from indictment to conviction), thus requiring *per se* reversal of his murder conviction. In the alternative, he maintains that the proper standard of review of the trial court's constitutional error is harmless error under *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), "because *Wilson–Bey* dramatically and unexpectedly changed the landscape of aiding and abetting in this jurisdiction," and because the trial court's jury instruction "affirmatively encourage[d] the jury to convict on first-degree murder without the requisite *mens rea.* ..." And, he argues that even if this court applies a plain error standard of review, his conviction must be reversed since (1) the trial court's error affected his substantial rights by depriving him "of his Fifth and Sixth Amendment rights to a jury verdict based on proof beyond a reasonable doubt of every element of the charge"; and (2) "[t]he error jeopardized the integrity of the judicial proceedings." While the government "agree[s] with [Mr. Kidd] that the trial court's aiding [ ] and [ ] abetting instruction constitut[ed] error that is plain or obvious pursuant to this court's holding in *Wilson–Bey,*"[8] it "dis-

---

bullets used to shoot Mr. Winslow came from a special .38 revolver.

**7.** Fort McNair is the location of the United States Army Military District of Washington.

**8.** That Mr. Kidd gets the benefit of our *Wilson–Bey* decision is clear. *See Roberts v. Unit-*

agree[s]" with Mr. Kidd's contention that his first-degree murder conviction must be reversed.

■ We first determine whether the constitutional harmless error standard must be applied due to a structural defect, that is, the failure of the trial court to instruct the jury correctly on the *mens rea* requirement of an aiding and abetting first-degree murder case. In light of Supreme Court precedent and our own cases, we reject Mr. Kidd's structural error argument. In *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the Court declared that "[t]rial errors," that is, those "which occur during the presentation of the case to the jury," do not require reversal of a conviction. *Id.* at 307–08, 111 S.Ct. 1246. We have said previously that *Fulminante* "drew a clear distinction between mere 'trial errors' and errors which amounted to 'structural defects' in the trial itself." *Lyons v. United States*, 683 A.2d 1066, 1070 (D.C.1996) (en banc). Structural defects "affect the framework within which the trial proceeds." *Fulminante*, 499 U.S. at 309–10, 111 S.Ct. 1246. Thus, "the category of 'structural defect' . . . is limited to fundamental constitutional errors," *Lyons*, 683 A.2d at 1071, those that are "too fundamental to be harmless," *id.* (citing *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). Given these legal principles, *Lyons* declared that "any error relating to the use of peremptory challenges cannot be regarded as a structural defect." *Id.; see also Shields v. United States*, 916 A.2d 903, 907 (D.C. 2007); *Johnson v. United States*, 804 A.2d 297, 304 (D.C.2002).

*United States v. Gonzalez–Lopez*, 548 U.S. 140, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006), reaffirmed the limited nature of the

ed States, 916 A.2d 922, 939 n. 22 (D.C.2007) (citing *Griffith v. Kentucky*, 479 U.S. 314, 107

structural defects category, identifying the types of constitutional errors which qualify as structural defects: "the denial of counsel, *see Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), the denial of the right of self-representation, *see McKaskle v. Wiggins*, 465 U.S. 168, 177–78 n. 8, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), the denial of the right to public trial, *see Waller v. Georgia*, 467 U.S. 39, 49 n. 9, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), and the denial of the right to trial by jury by the giving of a defective reasonable doubt instruction, *see Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)." *Id.* at 2564. *Gonzalez–Lopez* added to the list of structural defects, "erroneous deprivation of the right to counsel of choice, 'with consequences that are necessarily unquantifiable and indeterminate.' " *Id.* at 2564 (citing *Sullivan, supra*, 508 U.S. at 282, 113 S.Ct. 2078).

The Court has resisted adding jury instructional errors which omit an element of the charged offense to its list of structural errors. As the Court observed in *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), "[t]he error at issue here—a jury instruction that omits an element of the offense—differs markedly from the constitutional violations we have found to defy harmless-error review." *Id.* at 8, 119 S.Ct. 1827. The Court further explained:

Unlike such defects as the complete deprivation of counsel or trial before a biased judge, an instruction that omits an element of the offense does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.

*Id.* at 9, 119 S.Ct. 1827. Earlier, in *Johnson v. United States*, 520 U.S. 461, 117 S.Ct. 708, 93 L.Ed.2d 649 (1987).)

S.Ct. 1544, 137 L.Ed.2d 718 (1997), involving a perjury charge, the Court did not characterize the error as structural where, rather than properly submitting the element of materiality to the jury, the trial judge decided that issue. *Id.* at 463, 117 S.Ct. 1544. Because there was no objection, the Court resolved the case under the plain error standard and affirmed the conviction. *Id.*

Similarly, our decision in *Wheeler v. United States*, 930 A.2d 232, 241–42 and n. 5 (D.C.2007), concerned a challenge to a jury instruction—"the absence of any fingerprint evidence, standing alone, does not constitute reasonable doubt as to the firearm charges here." *Id.* at 242. There, as here, the appellant did not object to the instruction at trial, and we said, "this claim of instructional error is subject to plain error review." *Id.* at 241. In a sufficiency of the evidence case pertaining to first-degree premeditated murder where there was no objection to the aiding and abetting jury instruction, we conducted our analysis under a plain error standard of review. *Downing v. United States*, 929 A.2d 848, 863 (D.C.2007).

Only where there has been an objection has this court applied a constitutional harmless error standard in first-degree premeditated murder while armed cases which were tried under an aiding and abetting theory. We were careful in *Wilson–Bey, supra*, to ascertain whether, in fact, as required by Rule 30 of the Superior Court Rules of Criminal Procedure, appellants had raised the precise objection to the aiding and abetting jury instruction in the trial court that they presented for our review.[9] We concluded that "albeit imperfectly, the challenge to the natural and probable consequences instruction [was] adequately preserved." *Id.* at 829. Therefore, because "the error [was] of constitutional dimension, ... the *Chapman* harmless error standard should apply." *Id.* at 843 (citing *Neder, supra*, 527 U.S. at 15, 119 S.Ct. 1827). And, in *Kitt, supra*, the appellant objected to the instruction that he could be found guilty of first-degree premeditated murder "even if he did not intend it, so long as it was a 'natural and probable consequence of the other crimes (robbery, kidnapping, carjacking he did intend to commit".) *Id* at 354. "[B]ecause the government failed to present and the jury instruction failed to require the necessary proof of specific intent to kill, premeditation and deliberation by [appellant], we reverse[d] his first-degree premeditated murder conviction for insufficiency of the evidence." *Id.* at 355.

■ Here, there was absolutely no objection to the incorrect aiding and abetting instruction and our review is for plain error. *See Thomas v. United States*, 914 A.2d 1, 5–6 (D.C.2006); *United States v. Olano*, 507 U.S. 725, 732–37, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).[10] Since "[t]he correct rule with respect to premeditated murder ... is that the prosecution must prove that the defendant personally

---

9. Rule 30 provides, in pertinent part:

No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection.

10. We also have applied plain error review "where an indictment omits an element of the offense for which a defendant is later convict-

ed where there has been no objection." *Peay v. United States*, 924 A.2d 1023, 1029 (D.C. 2007). And, we held in *Smith v. United States*, 801 A.2d 958, 962 (D.C.2002), "that plain error review applies to a claim that an indictment has been constructively amended if an objection has not been made at the trial level." *Id.* at 962 (citing *United States v. Cotton*, 535 U.S. 625, 631–32, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002)).

had the requisite mental state to commit the offense—*i.e.,* that the defendant acted with a specific intent to kill after premeditation and deliberation-whether the defendant is charged as the principal actor or as an aider and abettor," *Kitt,* 904 A.2d at 354, Mr. Kidd has satisfied the error prong of the plain error standard. In light of our decision in *Wilson–Bey,* the error is now plain or "clear" and "obvious," *Olano,* 507 U.S. at 734, 113 S.Ct. 1770 (citations omitted), and Mr. Kidd has met the second prong of the plain error standard.

■■■ The third prong of the plain error standard focuses on whether the plain error affected Mr. Kidd's substantial rights. "Normally, although perhaps not in every case, the defendant must make a specific showing of prejudice to satisfy the 'affecting substantial rights' prong" of the plain error rule. *Olano, supra,* 507 U.S. at 735, 113 S.Ct. 1770. We conclude that this non-structural defect case does not fall within what the Court has identified as "a special category of errors that can be corrected regardless of their effect on the outcome . . . ., [or which] should be presumed prejudicial if the defendant cannot make a specific showing of prejudice." *Id.* Rather, this case is properly decided under the normal plain error rule where "the defendant rather than the Government [ ] bears the burden of persuasion with respect to prejudice." *Id.* at 734, 113 S.Ct.

1770.[11] Therefore, "[i]n order to show that the non-structural error in this case affected his substantial rights, [Mr. Kidd] must show a reasonable probability that the [aiding and abetting jury instruction] had a prejudicial effect on the outcome of his trial."

■■■ Mr. Kidd has not met his burden on the third prong of the plain error test. Given the government's proof, we are satisfied that there was no reasonable probability that the incorrect aiding and abetting instruction had a prejudicial effect on the outcome of Mr. Kidd's trial. "First degree premeditated murder is murder committed with the specific intent to kill after premeditation and deliberation." *Downing, supra,* 929 A.2d at 862 (quoting *Kitt, supra,* 904 A.2d at 353) (other citation and internal quotation marks omitted). "Deliberation requires a showing that the accused acted with consideration and reflection upon the preconceived design to kill." *Id.* (citation and internal quotation marks omitted). "Premeditation means that the defendant formed the specific intent to kill the victim for some length of time, however short, before the murderous act." *Id.* (quoting *Kitt, supra,* 904 A.2d at 353 (other citation and internal quotation marks omitted)). "Both premeditation and deliberation may be inferred from the surrounding facts and circumstances, and may

11. Thus, we do not follow the "modified plain error" rule. *See United States v. Viola,* 35 F.3d 37, 42 (2d Cir.1994) ("When the source of plain error is a supervening decision, the defendant has not been derelict in failing to object at trial, and there is thus no cause to shift the burden of proving prejudice to the defendant. In this special context, as in harmless error review . . .; the government must show that the error did not affect the defendant's substantial rights."); *see also United States v. Kaplan,* 490 F.3d 110, 124 (2d Cir.2007)) ("Ordinarily, the defendant asserting plain error bears the burden of persuasion as to prejudice, but under our 'modified plain–error review,' the Government bears that burden."). In *Thomas, supra,* we noted that "[a]lthough the *Viola* court's rationale for this modification of the plain error test is persuasive, no other Circuit has embraced it, and its 'continuing viability' after *Johnson* [520 U.S. at 467–68, 117 S.Ct. at 1549] has been questioned even in the Second Circuit." 914 A.2d at 22 n. 7 (citing *United States v. Stewart,* 433 F.3d 273, 294 n. 5 (2d Cir.2006)). We concluded that it was unnecessary to decide whether to follow *Viola* with respect to our analysis of *Thomas.*

occur in only a few seconds." *Id.* (citations omitted).

On the record before us, reasonable jurors could infer and conclude from the testimony of the Lindsays, Detective Owens, and Investigator McConnell, that beyond a reasonable doubt Mr. Kidd had thought about and reflected on killing Mr. Weaver, and further that he had the specific intent to participate in the killing, as evidenced by his possession of a gun pointed to the stomach or side of Mr. Weaver;[12] his anger and argument over Mr. Weaver's throwing paint balls at his car; his knowledge of the presence of a second man who stood on the other side of Mr. Weaver with a gun; his continuing gun-pointed presence next to Mr. Weaver while a third man approached rapidly and shot Mr. Weaver in the back of the head, mortally wounding him; and his flight immediately after the shooting. In short, the government presented strong and substantial evidence of premeditation, deliberation, and specific intent, uncontroverted by anything except Mr. Kidd's self-serving statement to Detective Owens that he was home in bed at the time of Mr. Weaver's murder. Indeed, the government emphasized premeditation and deliberation at the outset and end of its case before the jury, indicating during its opening statement that "this is a premeditated and deliberate killing," and stating during its closing argument that "[f]irst degree murder while armed is the premeditated murder of a person," and "there has to be some thought given to the murder of an individual." Thus, this case is strikingly different from *Kitt.* There, we reversed a first-degree premeditated murder while armed conviction "because the government failed to present and the jury

instruction failed to require the necessary proof of specific intent to kill, premeditation and deliberation." We said, "the circumstances of [the decedent's] killing remain shrouded in mystery." Here, there was no mystery since two eyewitnesses, who knew Mr. Kidd, described details of the shooting and identified him as a participant, and the government stressed premeditation and deliberation.

▇ Based upon our review of the record, we are convinced that Mr. Kidd was convicted of first-degree premeditated murder while armed because reasonable jurors inferred "from the facts and circumstances surrounding [the] murder" that he had "the requisite *mens rea,*" *Kitt,* 904 A.2d at 353. Hence, contrary to Mr. Kidd's argument, there was no "reasonable probability" that the trial court's incorrect aiding and abetting instruction "had a prejudicial effect on the outcome of his trial." *Thomas, supra,* 914 A.2d at 21. In short, the incorrect instruction "did not materially impact the jury's verdict." *Downing, supra,* 929 A.2d at 864 (citing *Wilson–Bey,* 903 A.2d at 846–47).

Even if Mr. Kidd's substantial rights had been affected by the incorrect aiding and abetting instruction, correction of the error is not required under the fourth prong of the plain error test, "whether the forefeited error 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *Thomas,* 914 A.2d at 22 (quoting *Johnson, supra,* 520 U.S. at 469–70, 117 S.Ct. 1544). Mr. Kidd had a fair opportunity to present his case to the jury. Reasonable jurors could conclude that the testimony of the eyewitness siblings was credible and reliable, and that based upon his own words during his interview with

---

12. "Carrying a gun to the scene of the murder is 'highly probative of premeditation and deliberation' because it suggests that the defendant arrived on the scene with a preconceived plan to kill." *Busey v. United States,* 747 A.2d 1153, 1161 (D.C.2000) (quoting *McAdoo v. United States,* 515 A.2d 412, 427 (D.C.1986)).

Detective Owens, Mr. Kidd had a motive to participate in a plan to shoot and kill Mr. Weaver. Furthermore, the jury verdict did not impugn the integrity or public reputation of the judicial proceeding against Mr. Kidd. To the contrary, on this record, "it would be the reversal of a conviction such as this which would have that effect.... No 'miscarriage of justice' will result here if we do not notice the error." *Johnson*, 520 U.S. at 470, 117 S.Ct. 1544 (quoting *Olano, supra*, 507 U.S. at 736, 113 S.Ct. 1770).

### Mr. Kidd's Other Arguments

 We are unpersuaded by Mr. Kidd's other arguments and dispose of them summarily. He challenges the trial court's admission into evidence of one of the two guns removed from his residence after Mr. Weaver's murder, mainly on the grounds that the gun "was not conclusively connected to the murder of Mr. Weaver," and that the government used the gun to "bolster[ ] the weak case against Mr. Kidd not by proving anything, but by adding to the appearances of the case." Our review of this issue is guided by the well known principle that the admissibility of evidence "is committed to the sound discretion of the trial court[,] and this court will not disturb its ruling absent an abuse of discretion." *Dockery v. United States*, 853 A.2d 687, 697 (D.C.2004). After discussion about the admission of two guns (one of which was discovered in Mr. Kidd's home but not in the box bearing his nickname), the trial court initially ruled, in part, "[t]he fact that a gun was recovered is relevant and it goes to the weight to argue that it wasn't the gun used." Later, the trial judge stated that if Mr. Kidd was "not going to be contesting the gun [the police] found was his, then [he] would feel comfortable limiting [the government] to one gun." Mr. Kidd responded that he would not dispute ownership of the gun found in the box with his nickname. Although there may be no evidence concerning whether a gun "was the gun used in the crime," it still may be admitted as probative evidence. *See Burgess v. United States*, 786 A.2d 561, 576 (D.C.2001). Moreover, on this record, and given our analysis above, we see no basis for the argument that the gun was used to bolster a weak government case. However, even assuming, without deciding, that the trial judge abused his discretion in admitting the gun found in the Brinks security box, we conclude that there would be no abuse of discretion because two eyewitnesses declared at trial that they saw Mr. Kidd with a gun pointed at Mr. Weaver's stomach or side.

 Mr. Kidd contends that "the government, under the claim of the prior identification rule, was able to give the jury several times the testimony of Rebecca Lindsay, its strongest witness," and thus improperly, to use a "weaker witness [for example, Alicia Hawkins] to bolster the testimony of [a] stronger witness by repetition." We disagree. "The exclusion of prior consistent statements is intended to avoid the prejudice of unfairly bolstering the witness' credibility." *Porter v. United States*, 826 A.2d 398, 410 (D.C. 2003) (citations omitted). However, "only in a case where the government's proof of guilt was 'marginal' have we thought the prejudice from this impermissible bolstering enough to warrant reversal without more." *Id.* (citations and internal quotation marks omitted). Here, the government's evidence against Mr. Kidd was strong. Thus, even assuming, without deciding, that the trial court erred by allowing other witnesses to repeat what Ms. Lindsay had told them about the murder, the error was harmless. *See id.* at 410–11.

Finally, Mr. Kidd asserts that the trial court erred by "significantly curtail[ing][ ][his] attempt to present another view of how the decedent was killed," that is, that "Mr. Weaver may well have been shot by 'friendly fire' aimed at Mr. Kidd." Hence, he argues, the trial court improperly curtailed his cross-examination of Detective Owens concerning his investigation of Mr. Winslow's shooting. "The Sixth Amendment guarantees to criminal defendants not only the right to confront and cross-examine witnesses against them, but also 'the right to present evidence that someone else committed the offense for which [he] is on trial.'" *Bruce v. United States,* 820 A.2d 540, 543 (quoting *Boykin v. United States,* 738 A.2d 768, 773 (D.C. 1999)). "However, '[a] defendant's right to pursue a particular line of cross-examination is circumscribed by general principles of relevance.'" *Id.* "A trial court's ruling on whether certain evidence is relevant or probative 'is a highly discretionary decision which will be upset on appeal only upon a showing of [abuse of discretion].'" *Id.* (citing *Gethers v. United States,* 684 A.2d 1266, 1271 (D.C.1996) (other citation omitted)).

Here, the trial court did not preclude all cross-examination regarding Detective Winslow's investigation into the shooting of Mr. Winslow; questions relating to those posed by the government as to that investigation were permitted. When defense counsel sought to conduct additional cross-examination of Detective Winslow, the trial court inquired whether counsel was attempting to show that Mr. Edwards "did something" or that the police "didn't investigate the Winslow shooting," he replied "Both." Defense counsel

explained that an eyewitness said Mr. Edwards shot Mr. Winslow, that his shooting was "related" to that of Mr. Weaver, and that "the court has heard all of the evidence from Mr. Mulderig and from Dr. Juste, but, more importantly, the evidence from Sergeant [Weeda]." [13] The judge expressed concern that "this doesn't elicit any evidence at all; just invites further hearsay and speculation...." Nevertheless, the trial court did thereafter permit additional cross-examination of Detective Owens regarding his investigation of the Winslow shooting. On this record, we are satisfied that even assuming that the trial court abused its discretion in curtailing defense counsel's cross-examination of Detective Owens, the error was harmless, given the eyewitness testimony.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*

---

13. Although at trial defense counsel referred only generally to the testimony from Dr. Juste, Officer Mulderig and Sergeant Weeda, on appeal he argues that there is some evidence from these witnesses that the shooting of Mr. Weaver was not at close range and that someone else shot him.