John D. WILLIAMSON, Appellant,

v.

UNITED STATES, Appellee.

Nos. 05–CF–461, 05–CO–857.

District of Columbia Court of Appeals.

Argued Feb. 4, 2010.

Decided April 22, 2010.

Steven R. Kiersh, Washington, DC, appointed by this court, for appellant.

Leslie Ann Gerardo, Assistant United States Attorney, with whom Channing D. Phillips, Acting United States Attorney at the time the brief was filed, Roy W. McLeese III and Glenn Leon, Assistant United States Attorneys, were on the brief, for appellee.

Before REID and KRAMER, Associate Judges, and FERREN, Senior Judge.

KRAMER, Associate Judge:

At the conclusion of a jury trial, appellant Williamson was found guilty on seven counts, including premeditated first-degree murder while armed ("first-degree murder"), possession of a firearm during the commission of a crime of violence, carrying a pistol without a license, assault with intent to kill while armed, threatening to do bodily harm, and two counts of obstructing justice. The charges stemmed from the fatal shooting of Sergio Chambliss and the wounding of Robert Dixon, Sr. during the same incident.

Williamson attacks the verdict on a broad front. He first argues that the jury, relying on the now-discredited standard jury instruction in use at the time, convicted him as an aider and abettor even though he lacked the requisite *mens rea* for first-degree murder.[1] Furthermore, in appealing the denial of his post-trial motion, he contends that the government failed in its obligation to disclose exculpatory witnesses under *Brady v. Maryland*[2] until the end of the trial. Additionally, he makes a *Winfield*[3] proffer of newly discovered evidence of his innocence.[4]

---

1. *See Wilson–Bey v. United States*, 903 A.2d 818, 836 (D.C.2006) (*en banc*) ("[T]he 'natural and probable consequences' doctrine cannot be permitted to dilute the principle that the *mens rea* required to prove premeditated murder, whether by a principal or by an accomplice, necessarily includes premeditation, deliberation, and a specific intent to kill."), *cert. denied*, 550 U.S. 933, 127 S.Ct. 2248, 167 L.Ed.2d 1089 (2007).

2. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

3. *Winfield v. United States*, 676 A.2d 1 (D.C. 1996) (*en banc*).

4. Though Williamson challenges the trial court's denial of his post-trial motion in its entirety, on appeal, he appears to have chosen not to develop all of the arguments he made in that motion. Briefly, Williamson also alleged that he was denied his Sixth Amendment right to the effective assistance of counsel because his attorney failed to challenge a potentially prejudiced juror, and that he was deprived of his constitutional right to participate in jury selection. We decline to address these issues since points noted in the appeal but not developed are considered abandoned. *Deramus v. Donovan, Leisure, Newton & Irvine*, 905 A.2d 164, 176 & n. 22 (D.C.2006) (the result of an appellant's failure to urge a point in its appeal brief is that we deem the point abandoned).

## I. Factual Background[5]

Undisputed evidence at trial established the following facts. At approximately 3:00 p.m. on January 17, 2003, an unidentified gunman opened fire at the passenger compartment of a truck which was towing an abandoned school bus into a storage yard near the intersection of 50th and Hayes Streets, Northeast. The gunman wounded the driver of the tow truck, Robert Dixon, Sr., and killed its passenger, Sergio Chambliss, before getting away. The gunman remains unidentified.

### A. The Government's Case

The government alleged that Williamson planned and orchestrated the killing because he had a "beef" with Chambliss. According to the government, Williamson suspected that Chambliss was involved with Williamson's girlfriend, Paula ("Peaches") Washington. Peaches had dated Chambliss before she moved in with Williamson, and Williamson suspected that Peaches might still be seeing Chambliss. The government also contended that Williamson believed Chambliss had burglarized his home.

The government introduced the testimony of Shawn Walker to corroborate its theory. Williamson told Walker that he had a "run-in" with Peaches's ex-boyfriend (Chambliss) sometime around November 2002. Williamson then asked Walker to procure a weapon "because he didn't know if the dude was going to come back or not." Walker sold Williamson a Glock 30, which is a .45 caliber pistol. After his

house was burglarized, Williamson spoke to Walker about the incident. He claimed that the burglars had entered into the bedroom where Peaches and he were sleeping. Williamson admitted to firing at the burglars using the weapon Walker had sold him. He told Walker that he believed one of the perpetrators had been Chambliss because, before the shooting started, Peaches asked, "Who is it"? and the perpetrator responded, "It's me, baby." Officer Nathaniel Davis, who responded to Williamson's 911 call on the night of the burglary, testified that Williamson admitted to exchanging fire with the burglars. The police recovered multiple pieces of evidence of a gun fight from the scene, including .45 caliber expended bullets. But they never recovered Williamson's weapon.[6]

The government also introduced the testimony of Robert Dixon, Sr. ("Lou") and his son, Robert Dixon, Jr. ("Robbie"). On the day Chambliss was killed, which was five days after the burglary, both men were riding in their tow truck with Chambliss. They reported driving past Williamson, who was standing next to one of his own distinctive-looking trucks.[7] A white Cadillac was parked next to Williamson's truck. Lou, who knew Williamson, honked his horn; Williamson looked up and waved. Lou reported that Williamson's facial expression changed to one of shock when he saw Chambliss riding with the Dixons, and he stopped waving. As they rode past, Chambliss apparently told Robbie that Peaches was in the Cadillac. He also said

---

5. Because Williamson's version of the events changed significantly during trial, as well as in his collateral attack, we present the facts as best as we can, but we do not describe every variation put forward by each party.

6. Williamson claimed that, before the police arrived at the scene, he gave the gun to a friend and told him to dispose of it.

7. Williamson owned and operated roll-off "dump trucks" of the sort used to carry dumpsters from construction sites. They are all white, with "Williamson" stenciled on the doors, as well as a cartoon character (the Tasmanian devil).

that there was a "beef" between himself and Williamson over Peaches, but that he believed it had been "squashed." Both Lou and Robbie reported seeing an unidentified man in the cab of Williamson's truck.

After this incident, Robbie noticed that Williamson's truck had started following theirs. When the Dixons and Chambliss arrived at the yard, Williamson's truck pulled over to the side of the road behind them. Robbie got out of the truck to move his own car, which was blocking the entrance into the yard. At the same time, he called Williamson on his cell phone, wondering why he had followed them. Williamson hung up after a brief, non-committal conversation. Meanwhile, the unidentified man got out of Williamson's truck and walked over to Dixons' truck. Lou and Chambliss were still inside. The unidentified man approached the passenger side and opened fire, killing Chambliss and wounding Lou. Lou tried to get out, but fell. Robbie noticed that his father was wounded and drove over in his car (which he was in the process of moving out of the way), picked him up and drove to the hospital. While they were on their way, Williamson called Robbie to offer him money to keep quiet about what had happened. He repeated the offer later that night. Several days later, he called again, this time leaving a threatening message on Robbie's answering machine.

Williamson's call records corroborated Robbie's testimony. An expert prosecution witness who examined the records placed Williamson's cell phone in the general area of the shooting that afternoon. Finally, a firearms expert for the government opined that all of the casings and bullets recovered from the murder scene had been fired from the same .45 caliber pistol. The markings on the casings were consistent with the conclusion that the pistol was a Glock, the same type of weapon Walker had allegedly sold to Williamson and Williamson had used on the men who broke into his home five days before Chambliss's murder. The expert could not say, however, whether the same pistol fired the bullets recovered from the murder scene and those recovered from Williamson's house after the burglary.

## B. The Defense Case

Williamson's main defense was that he was not at the crime scene. He countered Walker's testimony by presenting the testimony of DeShaun Washington, Peaches's daughter, who was present in Williamson's house the night it was burglarized. Washington testified that she heard the voices of both burglars and that neither sounded like Chambliss, whom she knew from the time he had dated her mother. She did not hear either burglar say, "It's me, baby." Williamson also impeached Walker's credibility. Christopher Plummer testified for the defense and reported overhearing Williamson talk to Walker while they were both in jail. Walker asked Williamson to pay his lawyer's fees. After Williamson refused, Walker stated that he would "put that fat ass n* * * * * in a trick bag."

Williamson presented testimony from three additional witnesses: Kisha Taylor, whose mother was Williamson's tenant; Derrick Johnson, one of his employees; and Willie Lynch, an acquaintance of Williamson's. All three witnesses denied seeing a Williamson truck near the scene. Instead, they all testified that they saw a man get out of a black car near the storage yard just before the shooting started. Taylor claimed to have seen this man fire at Dixons' truck.

Peaches also testified for the defense. She denied continuing a romantic relationship with Chambliss after she started dat-

ing Williamson, though she admitted to receiving a call from him approximately once a month, including on the day before the burglary. She denied that Williamson had a gun, and denied recognizing either of the burglars' voices. She contradicted Lou and Robbie's testimony that they had driven past Williamson who was standing beside a white Cadillac which Chambliss had identified as hers. She denied being with Williamson on the afternoon of the murder. She admitted that she drove a white Cadillac, but testified that it was being repaired during the week of the shooting. She also claimed that she had Williamson's cell phone that day. She testified that it was she who had called Robbie from Williamson's cell phone that afternoon.

Williamson testified in his own defense and confirmed the testimonies of the various witnesses on his behalf. He claimed that he owned three trucks, two of which were being driven by his employees in other parts of the city that day. He testified, along with another of his employees, that the third truck was inoperable with a ruptured gas tank. Therefore, he argued, none of his trucks could have been near the crime scene that day. He denied ever purchasing a .45–caliber pistol from Walker, or using one in self-defense during the burglary. According to Williamson, he was at a job site in another part of town throughout the day Chambliss was murdered. He asserted that the only time he called Robbie was in the evening, after he heard that Lou had been shot. He denied calling him in the afternoon, or at any other time that day. He testified that four days before the shooting, he had left Peaches's white Cadillac at Capitol Heights Auto Body for repairs, and he submitted a repair bill to buttress his testimony. The owner of Capitol Heights Auto Body later testified that he had never seen, nor worked on Peaches's white Cadillac. He described the receipt Williamson had submitted as a "fake."

## II. Legal Analysis

### A. Was the aiding and abetting instruction plain error?

 At trial, which took place before our *en banc* decision in *Wilson–Bey*, the government requested and received the then-standard aiding and abetting instruction without objection from the defense. Both parties on appeal agree that the now discredited instruction [8] failed to require the correct level of *mens rea* on the part of an aider and abettor. The aiding and abetting instruction given in this case amounted to what we have called "essentially ... a negligence instruction." [9] This does not end the inquiry, however. It merely shows that Williamson received an erroneous jury instruction. Where a defendant has failed to object to a deficient jury instruction, we review for plain error. [10] An appellant faced with the plain error standard bears a difficult burden. [11]

8. *See Wilson–Bey, supra* note 1.

9. *Wheeler v. United States*, 977 A.2d 973, 983 (D.C.2009).

10. *Kidd v. United States*, 940 A.2d 118, 125 (D.C.2007); *Downing v. United States*, 929 A.2d 848, 863 (D.C.2007).

11. *See Wilson v. United States*, 785 A.2d 321, 326 (D.C.2001) (Appellant "not only must establish error, but also that the error is plain and affects substantial rights. If he satisfies these three hurdles, he must then show either a miscarriage of justice, that is, actual innocence; or that the trial court's error seriously affected the fairness, integrity or public reputation of judicial proceedings.") (citing *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (quotation marks omitted)). *See also Jones v. United States*, 779 A.2d 357, 360 (D.C.2001) (holding that under plain error review, reversal is ap-

An erroneous aiding and abetting instruction that relieves the jury from having to find the requisite *mens rea* automatically satisfies the first two requirements ("error," that is "plain").[12] At the same time, we have yet to find either of the other two plain error requirements satisfied where there was sufficient independent evidence of the defendant's guilty state of mind to sustain the charges.[13]

Here, there was sufficient evidence from which a reasonable jury could infer Williamson's guilty state of mind. The government presented evidence of a grudge between Williamson and Chambliss. In addition, based on the facts in the record, the jury must have concluded that, although he did not pull the trigger himself, Williamson likely provided the murder weapon to his accomplice and drove him to and from the murder scene. Throughout the trial the prosecution's theory was that Williamson hatched the plot to kill Chambliss, and that he was the only person with the motive and the means to do so. The defense did not contend otherwise. Instead, the defense presented an alibi and advanced a misidentification theory, arguing that neither Williamson nor his truck were at the crime scene. Thus, in order to arrive at a guilty verdict, the jury had to have rejected Williamson's alibi as well as his misidentification theory.

*Kidd*[14] is on point. There, we affirmed appellant's conviction for first-degree murder "when he stood on one side of the victim while pointing a gun at his stomach; a second person stood on the other side with a gun; a third person came around the back and shot the victim in the head; and appellant immediately fled the scene."[15] We held that

> [R]easonable jurors could infer and conclude from the [government's] testimony ... that beyond a reasonable doubt Mr. Kidd had thought about and reflected on killing [the victim], and further that he had the specific intent to participate in the killing, as evidenced by his possession of a gun pointed to the stomach or side of [the victim]; his anger and argument over [the victim's] throwing paint

propriate "only in exceptional circumstances where a miscarriage of justice would otherwise result").

12. *Pérez v. United States*, 968 A.2d 39, 93 (D.C.2009) ("[T]he error is now plain because 'where a law at the time of trial was settled and clearly contrary to the law at the time of appeal—it is enough that an error be 'plain' at the time of appellate consideration.' ") (quoting *Johnson v. United States*, 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)).

13. An analysis of the cases in which we have cited *Wilson–Bey* for the relevant proposition shows that we have yet to find the instruction to have seriously undermined the integrity of the proceedings where there was some evidence of the defendant's guilty state of mind. *See, e.g., Wheeler, supra* note 9, 977 A.2d at 984 ("[T]he jury, in convicting [defendant] of conspiracy to murder, unanimously found the higher, requisite intent for premeditated murder because a conspiracy to murder could hardly involve any lesser intent."); *Pérez, supra,* note 12, 968 A.2d at 97 (noting that the integrity of the proceedings would be necessarily compromised where "there is a reasonable probability that the jury convicted appellants for first-degree murder as aiders and abettors without finding that they, personally, had the intent to kill ... and there is no evidence that would independently compel such a finding"); *Downing, supra* note 10, 929 A.2d at 864 ("[E]vidence of Downing's intent to murder Semino was overwhelming, and thus, the giving of the aiding and abetting instruction did not prejudice him or seriously affect the fairness, integrity, or public reputation of the judicial proceedings.") (citations and quotation marks omitted).

14. *Supra* note 10.

15. *Pérez, supra* note 12, 968 A.2d at 99 (summarizing *Kidd*).

balls at his car....[16]

Importantly, the evidence from which a jury could infer appellant's *mens rea* with respect to pre-meditation and intent to kill was uncontroverted by any defense evidence. The defense only presented defendant's own statement that he was not at the crime scene, which we discounted as "self-serving."[17] Given the substantial similarity between *Kidd* and this case, we hold, as we did in *Kidd,* that the erroneous aiding and abetting jury instruction did not violate Williamson's substantial rights, nor did it cause a miscarriage of justice.

## B. Brady violation

▇▇▇▇ Williamson asserts that the government failed to make timely disclosures of two witnesses who would have testified favorably for him. As an initial matter, we note that "there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."[18] With that in mind, we turn to Williamson's contention. He concedes that the government disclosed two potential witnesses, Demetrius Green and Demetrius Johnson, neither of whom testified at trial, but he asserts that the disclosure, made only four days before trial, came too late.

With respect to Demetrius Green, Williamson claims that the government's disclosure misled him into dismissing him as a critical witness. The prosecution disclosed that Green, who was near the murder scene, would testify that he saw Williamson's truck but could not identify its occupants. Williamson claims to have learned (after trial) that Green would instead have testified that both occupants of the truck were black males, neither of whom was Williamson. Williamson argues that Green's testimony could affirmatively confirm that Williamson was not at the murder scene. Under *Brady*, however, we have repeatedly held that "the due process obligation ... to disclose exculpatory information is for the purpose of allowing defense counsel an opportunity to investigate the facts of the case."[19] Here, Williamson does not argue that the government entirely failed to disclose Green's testimony, nor does he contend that the government knew Green contradicted the government's version of the incident. There is no showing that Green told the government that he did not recognize Williamson as one of the men in the truck. It was defense counsel's decision not to interview Green. Given the amount of conflicting testimony in this case, this may well have been a tactical error.

With respect to Demetrius Johnson, the government disclosed that he was at the scene. The government's *Brady* letter stated that Johnson "did not indicate" that he saw either Williamson or his truck there. According to Williamson, Johnson would have testified that he followed Dixons' truck to the yard in his own vehicle, but did not see Williamson's truck doing the same. We do not discern any failure to disclose on the government's part after comparing the *Brady* letter's description of Johnson's testimony to Williamson's version of it. What the government disclosed about Johnson's testimony is nearly

---

16. *Kidd, supra* note 10, 940 A.2d at 129.

17. *Id.*

18. *Pérez, supra* note 12, 968 A.2d at 70. *See Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (*Brady* violation established by a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.").

19. *Pérez, supra,* note 12, 968 A.2d at 66.

identical to what Williamson learned from Johnson later, that is, Johnson did not see a Williamson truck at the scene. Notwithstanding the fact that Johnson's alleged testimony contradicts Green's, Williamson asserts that Johnson's testimony would be additional affirmative proof that he was not at the murder scene.[20]

Williamson offered testimony from three witnesses who claimed to have seen the shooter get out of a black car. Green would have contradicted these defense witnesses by testifying that he saw Williamson's truck at the scene, as well as indirectly contradicting Johnson who allegedly would have testified that he did not see Williamson's truck there. Green's testimony would have also contradicted Williamson's own contention that none of his trucks could possibly have been at the scene. In other words, Green and Johnson would have only added to the conflicting and confusing defense accounts of what vehicle was at the scene and who was in that vehicle. We cannot say therefore, on the record before us, that the testimony of these two witnesses had a reasonable probability of producing a different verdict.

## C. Winfield proffer

■ In addition to the two witnesses above, Williamson's counsel proffered yet another piece of newly discovered evidence in support of a third-party perpetrator de-

fense: an admission by Von Lee, an ex-employee of Williamson's, who allegedly claims that he was present at the murder scene in one of Williamson's trucks, along with another man. Lee supposedly has also admitted to owning a .45 caliber gun. This admission purportedly bolsters Williamson's contention that he was not the person who drove the truck and the assailant to and from the site of the shooting. Critically, Lee has refused to sign an affidavit or to testify.[21]

■ A successful third-party perpetrator defense rests on "proof of facts or circumstances which tend to indicate some reasonable possibility that a person other than the defendant committed the charged offense."[22] At the same time, we exclude evidence that is "too speculative with respect to the third party's guilt."[23] We will uphold the trial court's rejection of *Winfield* evidence unless the court abused its discretion.[24] We find no abuse of discretion on these facts. Lee's alleged admission is completely uncorroborated, even by other defense evidence. There is no explanation as to Lee's motive for possibly being at the crime site in a Williamson truck at the exact moment Chambliss was murdered. No witnesses, including Williamson's own, ever placed Lee at the scene during the trial. Furthermore, Lee's contention that he drove Williamson's third truck to the scene was directly controvert-

**20.** Williamson tries to buttress his argument by highlighting the additional revelation that Johnson was apparently shown a single photograph of appellant, after which he stated that he did not know the person in the picture. It is difficult to see how the fact that Johnson does not know Williamson, if undisclosed, prejudiced the defense. His testimony would be that he did not see a Williamson truck at the scene, thus presumably he did not see Williamson himself, either. The fact that he does not know what Williamson looks like is therefore irrelevant.

**21.** Undeterred, Williamson's counsel suggests that he withdraw and then testify as to Lee's hearsay statements, since they would be admissible as statements against penal interest.

**22.** *Winfield v. United States*, 676 A.2d 1, 4 (D.C.1996) (*en banc*) (citation omitted).

**23.** *Id.* at 5.

**24.** *McCraney v. United States*, 983 A.2d 1041, 1050 (D.C.2009).

ed by Williamson's own testimony that the third truck was inoperable that day. Moreover, three defense witnesses testified to seeing the assailant get out of a black car, not a white truck, seemingly corroborating Williamson's contention that neither he nor one of his trucks were at the murder scene. We also fail to see how Lee's statement that he owns a .45–caliber gun helps Williamson, since there is no indication that Lee admitted that it was his gun which was used to murder Chambliss. Finally, given that Williamson has already attempted to procure perjured evidence and testimony, the trial court rightly viewed another admission by an ex-employee with skepticism, which was properly bolstered by the fact that Lee has refused to testify. On these facts, we cannot say that it was an abuse of discretion to refuse to permit Williamson's counsel to testify to Lee's "admission."

### IV. Conclusion

Having found no error sufficient to merit reversal, we uphold both the verdict and the trial court's denial of Williamson's post-trial motion.

*Affirmed.*