Lamiek Kareem FORTSON, Appellant,

v.

UNITED STATES, Appellee,

and

Harry T. Ellis, Appellant,

v.

United States, Appellee.

Nos. 06–CF–577, 08–CO–87.

District of Columbia Court of Appeals.

Argued May 19, 2009.

Decided Sept. 3, 2009.

Mindy A. Daniels, Esq., appointed by the court, for appellant Fortson.

Jonathan W. Anderson, appointed by the court, Public Defender Service, with whom James Klein and Jaclyn Frankfurt, Public Defender Service, were on the brief, for appellant Ellis.

Chrisellen Kolb, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, Thomas J. Tourish, Ann

K.H. Simon and Ann M. Carroll, Assistant United States Attorneys, were on the brief, for appellee.

Before REID, GLICKMAN, and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

Gerald Lee Whitfield was kicked and stomped to death in an alley behind the 1200 block of 16th Street, N.E., in the Trinidad neighborhood, during the early morning hours of June 28, 2002. After a six-day trial during February 2006, a jury found appellants Lamiek Kareem Fortson and Harry T. Ellis guilty of Whitfield's murder, convicting Fortson of armed first-degree pre-meditated murder and Ellis of armed second-degree murder. Ellis was also convicted of one count of obstruction of justice (arising from an attempt to interfere with the testimony of eyewitness Ebony McBeth). Appellants challenge their convictions on a variety of grounds. We affirm.

## I.

Initially, co-defendants Fortson and Ellis were tried before a jury during May 2005, but the trial ended in a mistrial when the jury was unable to reach unanimous verdicts. Subsequently, Fortson pled guilty to one count of obstruction of justice, a charge based upon his tampering with one of the jurors from the 2005 trial, Jevonda Blackson. Fortson's wife, Erica Williams, also pled guilty to obstruction of justice in connection with the jury tampering scheme.

### A. *The Jury Tampering Incident*

The background of the jury tampering convictions, which is pertinent to portions of the current appeal, is as follows.[1] When jury selection was about to begin in the first trial, Williams recognized one of the members of the jury venire, Blackson, as an individual with whom both Williams and Fortson had attended junior high school. Williams spoke to Blackson in a restroom at the courthouse and told her that her husband, Fortson, was about to stand trial. Blackson told Williams that "she got us," meaning that Blackson would "help us with the verdict." Williams obtained Blackson's jury number and gave it to Fortson's defense counsel, telling him that she knew this prospective juror. According to Williams, Fortson's counsel responded, "we got her," meaning that Blackson had been selected for Fortson's jury. Later, Blackson gave Williams a note with a telephone number where she could be reached, and Williams showed the note to Fortson's counsel. Thereafter, Williams and Blackson spoke every day or every other day during the trial, with Williams generally calling Blackson from a pay phone (a practice that, according to Williams, was per the instructions of Fortson's counsel). Williams, acting as a conduit for Fortson, provided Blackson with points about "the holes in the case" to argue to other jurors as they deliberated. Williams kept in touch with Fortson, who was in jail, by telephone. The Williams–Fortson telephone calls were monitored and taped. A recording of the calls was played for the jury during the second trial.

### B. *The Second Trial*

Fortson's and Ellis's second trial began on February 2, 2006. The government's witnesses included Ebony McBeth and Fatima McClain, both of whom witnessed the attack on Whitfield. McBeth testified

---

**1.** The government presented Williams's testimony as consciousness-of-guilt testimony in its murder case against Fortson.

that, at approximately 12:30 a.m. on the morning in question, she was in a bedroom of her home at 1220 16th Street N.E. Looking through an open window, she saw three men running down the alley behind her house, from the direction of Raum Street. Two men—one a tall, thin, dark-complected man who was dressed in a dark shirt, and the other a light-complected man who was wearing a white shirt—were chasing the third man. McBeth recognized the man in the white shirt as appellant Ellis. McBeth heard the third man, later identified as Whitfield, say that he "was playing about something he had said." When the men reached the middle of the alley directly behind McBeth's house, the man in the dark shirt grabbed Whitfield and knocked him down. Ellis and the man in the dark shirt then started kicking, stomping and beating on" Whitfield. McBeth saw Whitfield grab Ellis's leg as if "he was trying to get back up," but Ellis, still kicking and stomping, told Whitfield "to stop grabbing on his leg." McBeth never saw the victim strike a blow or defend himself in any way. For about thirty minutes, Ellis and the man in the dark shirt were both "kicking and stomping" on Whitfield and were "jumping up and down" on Whitfield's chest, face, back and upper body area. The man in the dark shirt did most of the jumping and stomping, but Ellis "did his share." Once Ellis "thought it was over," he walked back up the alley, along the way removing the white T-shirt that he had been wearing.

McBeth testified that after Ellis departed, the man in the dark shirt continued to stomp and jump on Whitfield, until a car pulled down the alley and stopped momentarily. Ellis was the driver. It appeared to McBeth that some words were exchanged between Ellis and the man in the dark shirt. The car then drove away down the alley and the man in the dark shirt walked back up the alley toward Raum Street.[2]

Detective William White testified that, when interviewed on the night of the incident, McBeth had further stated that the darker-complected assailant (the man in the dark shirt) was "holding onto the fence and jumping on [Whitfield's] face."

Fatima McClain, who was living next door to McBeth at 1222 16th Street, N.E., on the day of the beating, testified that, from her back balcony, she saw "two men coming down the alley with another man."[3] McClain recognized two of the men as Fortson and Ellis, whom she knew from the Trinidad neighborhood. McClain testified that she saw Fortson and Ellis "beat the third man to death" by "kicking, punching" and "[j]ust beating him."

Forensic pathologist Dr. Gertrude Juste performed the autopsy on Whitfield. She testified that he died as the result of blunt force trauma to his head, neck, and torso. His injuries "were concentrated on the head and neck" and were "to his head mainly," while, as Dr. Juste recalled from the autopsy report, there were no injuries to the extremities. Whitfield's mouth was crushed. His teeth were broken, as were bones in his nose and his jawbone, and his skull was visibly fractured, an injury of a type that "is going to happen if the head is against the ground and force is applied

---

**2.** McBeth also testified that sometime after the beating incident, an individual that she knew as "Kemo," whom she had seen with Ellis earlier on the night of the beating, asked her what she had discussed with police and told her that Ellis "said that if I knew any-

thing, ... he would pay me not to tell anything."

**3.** On cross-examination, McClain agreed that she told police that she saw a "man dragging another man down the alley with another man right behind him."

against the skull." The skin had been scraped away from his cheeks and left ear, consistent with his head having been in contact with concrete as force was applied. Whitfield's face was "grossly deformed" (so much so that his mother did not recognize him from the autopsy photograph when she went to morgue to identify him). The injuries were consistent with someone "jumping on Mr. Whitfield's face" and with two people having jumped and stomped on him at the same time while he lay on concrete, offering no resistance. Some of the blows tore Whitfield's tissues apart, the type of injury for which "[y]ou really need much more force" than a fist could supply. "There had to be several" blows to cause the injuries that Dr. Juste observed on Whitfield's body. There was hemorrhaging to the brain and the brain was "grossly swollen." This showed that Whitfield was alive "for some period of time" after the brain injury was inflicted since "if you die immediately, brain swelling doesn't occur." Whitfield had no defensive wounds, and because there was "blood splatter at a very low level" and because of the blood tracks on his body, Dr. Juste opined that he was "already on the ground" during the kicking. Whitfield also had injuries made by a sharp object, including stab wounds in the top of the head, cheek, and torso and a "gaping wound" along the sternum. These wounds were consistent with Whitfield's having been being stabbed with a small knife. Dr. Juste further testified that Mr. Whitfield's body bore "clear markings of [bloody] shoe prints, overlapping markings of [several] shoe prints."

Several police officers and an FBI forensic examiner testified about the blood and DNA evidence discovered at the crime scene and in Ellis's car. There were pools of blood around Whitfield's head, on his face and on the ground around him. There were bloody shoe prints on Whitfield's chest, and a bloody trail, including a bloody boot print, led from his body through the alley towards Raum Street. DNA analyses revealed that the blood in the alley belonged to Whitfield and Fortson; Ellis's DNA was not found on the scene. Blood found at various locations on the passenger side of Ellis's car belonged to Whitfield and Fortson. A "fairly heavily-stained" white shirt recovered from the driver's seat also contained Whitfield's blood.[4] A small pocket knife was recovered from the middle console of Ellis's car, but serological testing indicated that it contained no blood.[5]

Appellant Fortson was the only defense witness. He testified that on the day in question, he was playing a game of craps along with Whitfield and a man named Odell. Fortson and Whitfield "got into an argument over a bet in the crap game." Fortson testified that Whitfield swung at him with a sharp object, cutting him on the arm. Fortson "took off running" through the alley, but Whitfield followed and caught up with him, and the two exchanged punches. Odell arrived and hit Whitfield, who fell to the ground. Fortson and Odell then started kicking and punching Whitfield. Fortson testified that he hit Whitfield about five times and kicked him about three times, in the chest area, and then left after two or three minutes because his arm was bleeding. Fortson left Odell in the alley, still kicking Whitfield. As Fortson was walking away, his friend Ellis drove up behind him and gave him a

---

4. Police recovered a part of the driver's seat cushion cover because it was "red stained," but there was no testimony about analysis of the stain.

5. The government also called Williams as a witness. She testified that Fortson returned home at 1:30 a.m. on the morning of June 28, 2002, drunk and without any shoes.

ride back to his own car. Fortson took off a white shirt he had been wearing and left it in Ellis's car.

Fortson admitted that he "participated in the murder" and agreed that Whitfield never resisted during the assault. He denied, however, jumping on Whitfield or kicking him in the head. His goal was not to kill Whitfield but to "hurt him," and he did not think that Whitfield was dead when he left the scene. Fortson also acknowledged that Odell was killed sometime after the day in question.

## II.

■ Fortson's first argument on appeal is that he is entitled to reversal of his convictions because a ruling by the trial court deprived him of the defense attorney who was most familiar with his case.[6] The relevant background is as follows. Before the second trial, but following the arrest and indictment of Fortson for obstruction of justice (jury tampering), the government moved to disqualify the lawyer who had represented Fortson during the first trial and who was continuing as his counsel.[7] The government asserted that, during many of the tape-recorded telephone conversations between Fortson and Williams, Williams referred to conversations she had had with counsel about jury selection and about jury deliberations. The government argued that it was entitled to delve into counsel's knowledge of those conversations. At a minimum, the prosecutor told the court, Fortson's coun-

sel would be called as a witness (against Fortson) before the grand jury in the obstruction-of-justice case.[8] The prosecutor represented that Fortson's counsel was "inextricably intertwined as his name comes up all over the place" and that the government was continuing to investigate whether Fortson's counsel had participated in the jury tampering conspiracy. Through his own counsel, Fortson's counsel opposed the motion to disqualify, and he represented as "an officer of the Court" (though not as a sworn witness) that he lacked "any knowledge of any alleged conspiracy or any wrongdoing at all." The trial court granted the government's motion to disqualify on the grounds that Fortson's counsel was going to be a witness in an upcoming prosecution against his client.

■ A court "may not unreasonably interfere with the accused's choice of counsel," *Harling v. United States*, 387 A.2d 1101, 1104 (D.C.1978), because "the selection of an attorney is often the most important decision a defendant makes in shaping his defense." *Douglas v. United States*, 488 A.2d 121, 142 (D.C.1985) (internal quotations and citation omitted). Therefore, even where there is an actual conflict between the interests of the accused and those of his attorney, a court may accept a defendant's waiver of his right to conflict-free counsel, to preserve the defendant's right to be represented by counsel of choice. *See id.* at 139. Nevertheless, "the right to be represented by counsel of choice ... is not absolute," *id.*

6. Fortson relies on *United States v. Gonzalez–Lopez*, 548 U.S. 140, 150, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006) ("erroneous deprivation of the right to counsel of choice" is "structural error" requiring automatic reversal) (internal quotation marks and citation omitted).

7. See the discussion in Part I.A. *supra.*

8. Fortson's indictment (read in light of facts to which Williams testified at trial) indicates

that Fortson's counsel did in fact testify before the grand jury. The indictment describes his testimony as the testimony of "Co–Conspirator A" about Fortson's and Williams' juror tampering. Both Fortson and juror Blackson were indicted, and Williams entered into a plea agreement before indictment. Fortson's counsel was not indicted.

at 142, and a trial court has "discretion to disallow a first choice of counsel that would create serious risk of conflict of interest," *Gonzalez–Lopez, supra* note 6, 548 U.S. at 148 n. 3, 126 S.Ct. 2557; *see also id.* at 152, 126 S.Ct. 2557 (a defendant may not "demand that a court honor his waiver of conflict-free representation"). In determining whether to accept a waiver, a court must consider the potential of the conflict to adversely affect the effectiveness of counsel. *Freeman v. United States,* 971 A.2d 188, 194 (D.C.2009) (where the trial court learns of "the possibility of conflict" between the interests of the accused and those of his attorney, the court has an "affirmative duty to inquire into effectiveness of counsel") (internal quotation marks and citation omitted); *see also id.* at 197 n. 8 (trial court could properly reject defendant's waiver of conflict on grounds that defendant could not anticipate exactly what information his counsel might refrain from placing before the jury). In addition, "the trial court has an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 194 (citations and internal quotation marks omitted); *Pinkney v. United States,* 851 A.2d 479, 489 (D.C. 2004) (trial court did not abuse its discretion in refusing defendant's waiver of conflict because "the appearance of impropriety was too great under the circumstances presented here"); *see also United States v. Kerik,* 531 F.Supp.2d 610, 620 (S.D.N.Y. 2008) (waiver may be insufficient to cure the problem posed when a defendant's advocate is also a witness, because the fact-finding process is impaired, meaning that the government, too, is potentially preju-

diced by the defense attorney's continued involvement). Because a trial court "must be allowed substantial latitude in refusing waivers of conflicts of interest," *Wheat v. United States,* 486 U.S. 153, 163, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988), we will reverse a conviction on the basis of disqualification of counsel only if the trial court abused its discretion in determining that a conflict existed and that the conflict should not be waived.[9]

▮▮▮▮ Here, the government proffered sufficient facts to "alert the trial court to the possibility of a conflict." *Gibson v. United States,* 632 A.2d 1155, 1159 (D.C. 1993) (internal quotation marks, italics, and citation omitted). Numerous courts have found an actual conflict of interest in circumstances similar to those presented here. *See, e.g., United States v. Levy,* 25 F.3d 146, 156 (2d Cir.1994) (collecting cases involving attorneys who were implicated in, were being investigated for, or were accused of crimes related to those of the client). In such cases, harm to the client is virtually unavoidable, because "[i]f the allegations [against the attorney] are true, then "the attorney may fear that a spirited defense could uncover convincing evidence of the attorney's guilt or provoke the government into action against the attorney" and, in any case, "the attorney [would] not [be] in a position to give unbiased advice to the client" because of his personal stake in the case. *United States v. Fulton,* 5 F.3d 605, 610 (2d Cir.1993). In this case, the trial court could reasonably expect that if the government's allegations were false, Fortson's counsel would be unable to expose their falsity without testifying himself, in violation of his ethical obligations; and that if the government's

---

9. Whether a conflict of interest exists is a "mixed question of law and fact," so "we accept the trial court's factual findings unless they lack evidentiary support, and we review legal issues de novo." *Freeman, supra,* 971 A.2d at 202 (quoting *Veney v. United States,* 738 A.2d 1185, 1193 (D.C.1999)).

allegations were true, Fortson's counsel would be loathe to call Fortson to testify in his own defense for fear that Fortson would implicate his counsel. We cannot conclude that the trial court abused its discretion in finding that there was a serious conflict of interest warranting disqualification of Fortson's counsel (notwithstanding any waiver that Fortson might have given).[10] Although Fortson argues that the trial judge ruled prematurely (*i.e.*, before seeing whether indictments would be handed down and whether any obstruction of justice charges would be joined with the murder charges at the second trial), we are satisfied that the seriousness and nature of the government's allegations and the importance of the court's obligation to ensure that there was no appearance of impropriety gave the court an ample reasonable basis not to defer its ruling.

### III.

Early in the Superior Court proceedings, Ellis moved for severance on the ground that any allusions the government would make during the second trial to Fortson's jury tampering and to the resultant mistrial would unduly prejudice Ellis's own defense. The court denied the motion, but Ellis renewed it after the prosecutor said the following during her opening statement:

[Y]ou see, this case has already gone to trial once, last year May 2005. . . . And you're going to hear that it ended in a hung jury, when a jury couldn't reach a verdict. And as things go, we all would have gone on except for one thing, Lamiek Fortson's big mouth.

Because you're going to hear, ladies and gentlemen, that the reason there was a mistrial is because Lamiek Fortson knew a juror, he knew a juror that was sitting, hearing the evidence on his case. And how do we know that? Because he bragged. What was the point of getting away with it if you weren't going to be able to brag; and brag he did.

. . .

And you're going to hear that Erica Williams was basically the conduit, she would communicate with the juror, and then she in turn would communicate with Lamiek Fortson.

Fortson's counsel made no objection to the prosecutor's remarks, but Ellis's counsel argued that the prosecutor's statement "that the jury hung because of this one juror, implies for Mr. Ellis . . . that there was 11 to 1 against him." As an alternative to severance, Ellis asked the court to rule that "when the witness testifies . . . the government [may] only elicit that the

---

**10.** We say "notwithstanding any waiver that Fortson might have given" because the record does not show that Fortson himself actually waived the conflict or opposed the motion for disqualification. (Of course, Fortson's counsel's opposition to disqualification could not waive his client's right to conflict-free counsel. *See Douglas, supra,* 488 A.2d at 144.)

Had the court's ruling that deprived Fortson of his (apparent) counsel of choice been erroneous, the ruling would not have been rendered harmless by the fact that substitute counsel was effective. *Gonzalez–Lopez, supra,* 548 U.S. at 148, 126 S.Ct. 2557 ("Where the right to be assisted by counsel of one's choice is wrongly denied, therefore, it is unnecessary

to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation. Deprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received."). We note nevertheless that, while Fortson asserts that he "had the right to representation from an attorney [whom] he trusted" and who was "already familiar with his case," he does not assert that he did not trust the counsel who represented him at his second trial, and he makes no claim that his new counsel failed to become familiar with his case.

prior juror voted not guilty in Mr. Fortson's trial." The court "didn't see anything wrong" and denied the motion.

■ When the government was about to play the tapes of the recorded telephone conversations between Fortson and Williams, Ellis's counsel again raised an objection. He focused on the following exchange:

Fortson: [D]uring deliberation, everybody . . . gotta say you're guilty.

Williams: I know.

Fortson: So, but if eleven people say guilty . . .

Williams: I know, and one say not, you're gonna have a hung jury.

Fortson: That is a mistrial.

Ellis argued that playing this exchange "sends a message to the jury that the last jury was eleven to one, especially combined with some of the comments made by [the prosecutor] in opening." The prosecutor replied that, on the tape, Fortson was "not talking specifically about his own [juror] count" but was giving "kind of a little tutorial on what mistrial and hung jury means." The court responded, "I don't think this states that the jury's deliberations were eleven to one . . . It doesn't tell me the split. I am going to allow that in." Fortson's counsel said only, "I would ask the court not to make decisions on what is coming in and what is not coming in until I have an opportunity to be heard. I have different issues." He then stated,

"My objection is relevance [to the issue of Fortson's allegedly guilty state of mind]. I will cease with that."

■ Now, both appellants contend that the net effect of the prosecutor's opening statement and the tape excerpt quoted above was that the government "was essentially informing the jury that the split was eleven to one for guilt" and that "all but the tainted juror in the previous trial had concluded the evidence established guilt beyond a reasonable doubt." Appellants argue that through these presentations to the jury, the government "made abundantly clear its belief that [appellants] would have been convicted in the first trial save for Fortson's improper contact with a juror." This message, appellants assert, undermined the new jury's ability to presume the defendants' innocence.[11]

As courts have recognized, informing jurors that their predecessors in a former trial unanimously or near-unanimously voted to convict a given defendant has the potential to "intolerabl[y] dilut[e] . . . the presumption of innocence to which [the defendant] [i]s constitutionally entitled." *Cappadona v. State*, 495 So.2d 1207, 1208 (Fla.Dist.Ct.App.1986). "[E]vidence of the earlier jury's conclusions" may "serve[ ] only to confuse and mislead the [current] jurors into surmising that such a finding had a bearing on their task." *In re Lomax*, 367 A.2d 1272, 1281–82 (D.C.1976)

---

**11.** As noted, during trial, Fortson never complained about the prosecutor's remarks, or about the prosecutor's playing of the tape of the Fortson–Williams conversation, other than on relevance grounds. Hearing only Ellis's objection to the government's reference to a "hung jury," the trial court's approach was to require the prosecutor to avoid drawing any link between Ellis and the juror tampering incident, rather than to limit more generally the government's statements and presentation of evidence relating to the juror

tampering and mistrial. Accordingly, we review Fortson's argument on appeal only for plain error. "Under plain error review, appellant must show error that is clear and that affected appellant['s] substantial rights. If those three preliminary requirements are met, the court may notice the error and grant relief if the error would call into serious question the fairness, integrity or public reputation of judicial proceedings." *Perez v. United States*, 968 A.2d 39, 92 (D.C.2009) (citation omitted).

(reversing and remanding for new trial where attorney improperly commented in a civil commitment proceeding that an earlier jury had adjudged her client not dangerous).

We are not persuaded, however, that— whether taken separately or in combination—the prosecutor's statement in issue here and the excerpt of the Fortson–Williams conversation about the significance of an eleven-to-one jury vote conveyed to the jury either that the previous trial resulted in an eleven-to-one vote to convict, or that appellants would have been convicted but for the jury tampering and mistrial. To begin with, in her opening statement,[12] the prosecutor made no mention of an eleven to one split (or of any split at all). We are doubtful that the prosecutor's statement that the first trial ended in a "hung jury" would have been understood by the jurors, when they retired to deliberate, to mean that all the untainted jurors (*i.e.,* all jurors except Blackson) had voted to convict. For one thing, it is possible that the jury "couldn't reach a verdict" and "h[u]ng," not because jurors voted and were split, but because one or more jurors simply refused to deliberate.[13] For another, it is just as likely that Williams's testimony about "holes in

the case" during the first trial (which the context suggests was a reference to "holes" in the government's case) caused members of the second jury to think that at least some impartial first-trial jurors would have discerned reasons to doubt appellants' guilt [14] (even if Blackson had not drawn her fellow jurors' attention to the "holes," pursuant to her scheme with Williams and Fortson).[15] In short, especially in light of the other testimony at trial, we do not interpret the prosecutor's ambiguous statements "to have [the] most damaging meaning." *Donnelly v. De-Christoforo,* 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) ("a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations").

Further, the context of the tape recording supports the prosecutor's statement that, in discussing an eleven-to-one split, Fortson was giving "kind of a little tutorial" about hung juries, not commenting on the status of the first jury's deliberations. The conversation immediately preceding the controversial statement was as follows:

12. We note, as an aside, that the jury may not have attached as much importance to (or even remembered) the prosecutor's opening remarks as it might have if the comments had been part of her closing statement. While a "prosecutor's stress upon the centrality of particular evidence in closing argument" may significantly influence the jury, *Morten v. United States,* 856 A.2d 595, 602 (D.C.2004), it is less clear that similar statements in opening would have equal impact, because they are heard before the jury knows the evidentiary framework of the case.

13. *See, e.g., Harris v. United States,* 738 A.2d 269, 276–77 (D.C.1999) (where "one juror had declared to the others that under no circumstances would he return a verdict of

first-degree murder," he effectively "left the jury with the choice of being hung or returning some other type of a verdict").

14. That suggestion may comport with reality. During a colloquy with counsel about the tape excerpt, the trial judge said, "In fact, I believe you all told me at the last trial that it was a different split [*i.e.,* not an eleven-to-one split]." Ellis's counsel responded, "It was a different split."

15. In addition, Williams's testimony may have alerted the second jury that "holes" might continue to exist in the government's case. In other words, Williams's testimony likely suggested to jurors that the second trial should not be a "slam dunk" for the government.

Fortson: [I]f they tell you they got a verdict for me, and you already know what it is.

Williams: I'm already know what it is?

Fortson: Yeah.

Williams: How?

Fortson: Because ... if during the deliberation, if one person if during the deliberation, everybody gotta say you're not guilty.

Williams: I know.

And, following the "eleven-to-one" comment, Fortson and Williams continued:

Fortson: ... [T]hey don't call it a mistrial at first. They just send a note out and tell 'em and keep saying we haven't reached a verdict yet.... And the judge will call them out there and ask them for a poll, meaning who ... is saying guilty and who is saying not guilty ...

Williams: They gotta redo the trial when the[y] call a mistrial.

Fortson: Yeah, but, if ... [they] say they got a verdict, then you know what it is.

Listening to the recording of this conversation, along with Williams's accompanying testimony,[16] the second set of jurors would have no basis for concluding that, at the time the conversation took place, the first jury had actually voted eleven-to-one to convict (or even that Fortson and Williams expected this outcome). Fortson spoke to Williams in purely hypothetical terms and said nothing about where the first jury actually stood. Moreover, he emphasized

that a jury can arrive at a verdict only if all twelve members agree, a reminder that *any* lack of consensus among the first jurors—whether, for example, jurors were 11–1 for conviction or 11–1 for acquittal or divided evenly—would work in his favor by forcing a mistrial.

Thus, for many reasons, "it is by no means clear that the jury ... would seize such ... comment[s] out of context and attach this particular meaning" to them— *i.e.,* the particular meaning that appellants ascribe to the prosecutor's opening remarks and the Fortson–Williams tape recording excerpts. *Donnelly, supra,* 416 U.S. at 644, 94 S.Ct. 1868. Accordingly, we cannot agree with appellant Ellis that the court erred by allowing trial to proceed with the jury having heard the statements and tape recorded conversation in issue (and, *a fortiori,* appellant Fortson has not met his burden to show that the court plainly erred in not declaring a mistrial).

 For Ellis, the prosecutor's statements and tape excerpts about a hung jury also are the basis for his argument that the court erred in denying his renewed motion for severance, *i.e.,* a separate trial at which the tape recording relating to Fortson's jury tampering would not have been admissible. However, we will reverse the denial of a motion for severance only upon a clear showing that the trial court abused its broad discretion, which must entail a showing "not simply that [appellant] was prejudiced but that [he] suffered 'manifest prejudice' from ... joinder."[17] That test is not met here.

---

16. Williams testified, immediately after the government played the recording, that she understood Fortson's statement "if they got a verdict, then we know what it is" to mean that "if [the jurors] all come back with the same thing, we know all of them agree and that it is not guilty."

17. *Payne v. United States,* 516 A.2d 484, 489–90 (D.C.1986) (stating also that "a defendant does not suffer 'compelling prejudice' merely because a significant portion of the government's evidence admitted at trial is applicable only to his codefendants" and rejecting appellant's argument that "because he was neither charged with obstruction of justice nor impli-

During her opening and closing arguments, the prosecutor mentioned the evidence of juror tampering only in connection with Fortson, leaving no ambiguity about Ellis not having participated. When questioning Fortson's wife, Williams, about her interactions with juror Blackson, the prosecutor elicited testimony that Blackson's promises to help "us" referred to Fortson and Williams, not to Fortson and Ellis. Paul Rangolan, another government witness who testified about the jury tampering scheme, specified on cross-examination that Fortson's "three-way call[s]" from the jail describing the defense's interactions with Blackson involved Fortson, Wiiliams, and Fortson's attorney, not Ellis. The court instructed the jury that the "evidence that the defendant Fortson was allegedly involved in an effort to obstruct justice concerning a juror in [his] prior trial" should "only [be] consider[ed] . . . as to defendant Fortson's consciousness of guilt" and not against Ellis. The judge also instructed, more generally, that the jury "should give separate consideration and render separate verdicts with respect to each defendant [because] each defendant is entitled to have his guilt or innocence . . . determined from his own conduct, and from the evidence which applies to him as if he were being tried alone." For all these reasons, we can find no manifest prejudice to Ellis from the court's denial of his motion for severance.

## IV.

■■■■ Fortson challenges the sufficiency of the evidence underlying his conviction. First-degree premeditated murder, the offense for which Fortson was found guilty, "is murder committed with the specific intent to kill after premedita-

tion and deliberation." *Kidd v. United States*, 940 A.2d 118, 127 (D.C.2007). "To prove premeditation, the government must show that a defendant, before acting, gave thought to the idea of taking a human life and reached a definite decision to kill, while deliberation is proved by demonstrating that the accused acted with consideration and reflection upon the preconceived design to kill." *McAdoo v. United States*, 515 A.2d 412, 427 (D.C.1986). "[T]he evidence must demonstrate," in other words, "that the accused did not kill impulsively, in the heat of passion, or in an orgy of frenzied activity." *Kitt v. United States*, 904 A.2d 348, 353 (D.C.2006) (quoting *Frendak v. United States*, 408 A.2d 364, 371 (D.C.1979)). "Both premeditation and deliberation may be inferred from the surrounding facts and circumstances, and may occur in only a few seconds." *Downing v. United States*, 929 A.2d 848, 862 (D.C.2007).

While a passerby possibly would have characterized the kicking and stomping of Whitfield as "frenzied," the record was sufficient for the jury to infer both premeditation and deliberation. *Downing v. United States*, 929 A.2d 848, 862 (D.C. 2007). McBeth, who watched the entire incident, testified that Fortson pursued Whitfield down the alley, until Fortson caught up with his victim mid-alley and threw the punches that knocked him down. This testimony supported an inference that Fortson had ample time to reflect on his actions and ample time for any initial rage, provoked perhaps by Whitfield's apparently offensive comment, to peter out. *See Bates v. United States*, 834 A.2d 85, 95 (D.C.2003) (evidence that appellant ran 106 feet in pursuit of decedent showed that he had "sufficient time to form the intent to kill"). Additionally, Detective White re-

cated in any of the testimony concerning threats and intimidation, he was unduly prejudiced by the admission against his codefen-

dants of evidence of their various attempts to harass and intimidate [witnesses]").

counted McBeth's statement that Fortson held onto a fence at one point while jumping on top of Whitfield's face, from which the jury could reasonably infer that Fortson deliberated about how to increase the force of his assault. *Cf. Hall v. United States*, 454 A.2d 314, 318 (D.C.1982) ("the necessary interruption and subsequent continuation of appellant's criminal act while decedent lay in this vulnerable position is sufficiently probative to support an inference of premeditation"). Testimony that most of Whitfield's injuries were to his head and resulted from extremely forceful blows further indicated that Fortson intended to inflict fatal harm. And the evidence that Whitfield suffered stab wounds in addition to blunt-force trauma suggested that Fortson (who himself was bleeding, and could have been cut while wielding a knife) brought a knife to the scene, an action "highly probative of premeditation and deliberation." *Thacker v. United States*, 599 A.2d 52, 57 (D.C.1991) (citation omitted). Finally, the jury could infer from the evidence that Whitfield sustained his injuries while face-down on the ground and that he had no defensive wounds that Fortson did not act to protect himself from Whitfield or to counter his blows. *Cf. Head v. United States*, 451 A.2d 615, 623 (D.C.1982) ("fact that [decedents] were shot ... as they lay face down on the ground gives rise to an inference of a calculated plan rather than an impulsive act"). We have no hesitation in concluding that, cumulatively, the evidence permitted the jury to find Fortson guilty of first-degree premeditated murder.[18]

## V.

■ Both appellants cite as reversible error the aiding-and-abetting instruction that the court gave the jury. Over objections of defense counsel that the aiding and abetting instruction would allow appellants to be convicted without a finding that they had the requisite *mens rea*, the court instructed the jury as follows:

> It's not necessary that the defendant have the same intent that the principal offender had when the crime was committed, or that he had intended to commit the particular crime committed by the principal offender.
>
> *A[n] aider and abetter is legally responsible for the acts of other persons that have natural and probable consequences to the crime in which he intentionally participates. ...*
>
> It is sufficient if you find beyond a reasonable doubt that the crime was committed by someone, and that the defendant knowingly and intentionally aided and abetted the principal offender in committing the crime. The government need not prove who struck which blow, or which blow did the damage that led to Gerald Lee Whitfield's death. The government need not prove that both defendants Ellis and Fortson had the same intent.
>
> It is enough that the government proves beyond a reasonable doubt that one participant had the specific intent to kill Gerald Lee Whitfield in the case of first degree murder while armed; or acted with an intent to kill or seriously injure, or in conscious disregard of an extreme risk of death o[r] seriously [sic] bodily injury to Gerald Lee Whitfield in the case of second degree murder while armed; ... and that the other partici-

---

**18.** *Cf. Patton v. United States*, 633 A.2d 800, 820 (D.C.1993) (evidence that victims were each stabbed repeatedly over their entire bodies and suffered numerous blunt force injuries on their heads and faces could properly be joined with other factors to support such an inference of premeditation and deliberation).

pant knew of that degree of intent and helped in some way to bring that about. . . .

It is sufficient if you find beyond a reasonable doubt that a crime was committed either, in the case of first or second degree murder while armed, by someone, and that the defendant knowingly and intentionally participated in it either as a principal or as an aider and abettor.

(Italics added). Thus, the instructions that the court gave included language virtually identical to the "natural and probable consequences" language that we subsequently (five months after appellants' trial) held to be legally erroneous in the context of a first-degree premeditated murder prosecution.[19] *See Wilson–Bey v. United States*, 903 A.2d 818 (D.C.2006) (en banc). We reasoned in *Wilson–Bey* that the "natural and probable consequences" language "impos[ed] criminal liability upon an accomplice for foreseeable consequences [of his actions], without proof that the accomplice intended those consequences." *Perez, supra* note 11, 968 A.2d at 93 (quoting *Wilson–Bey, supra*, 903 A.2d at 837). Contrary to "basic notions of criminal responsibility" and to the Constitution, the instruction thus permitted "liability to be predicated upon negligence even when the crime involved requires a different state of mind." *Wilson–Bey, supra*, 903 A.2d at 837, 834 (internal quotation marks and citation omitted). We declared the "natural and probable consequences" instruction legally erroneous because we concluded that, to obtain a valid conviction for first-degree murder on an aiding-and-abetting theory, the prosecution must "prove that the accomplice acted with" the requisite mental

state, to wit, "premeditation and deliberation and intent to kill." *Id.* at 830.

In *Coleman v. United States*, 948 A.2d 534 (D.C.2008), we applied *Wilson–Bey* to reverse a defendant's conviction for armed second-degree murder as a lesser included offense of armed first-degree murder. We reasoned that, because the trial court had included the impermissible "natural and probable consequences" language in its explanation of aiding-and-abetting liability, the jury in that case could have found defendant Jones guilty of second-degree murder so long as it found that he negligently provided the principal (defendant Coleman) with the gun which the principal used to kill the decedents. *Id.* at 553–54. The jury may have convicted Jones even if it did not believe that the government had proved beyond a reasonable doubt that he possessed either an "intent to kill" or a "conscious disregard of an extreme risk of death or serious bodily injury," as is required for second-degree-murder liability. *Id.* at 553.

■ For this Court to uphold a judgment of conviction for first-or second-degree murder obtained where the trial court has given the erroneous "natural and probable consequences" instruction over a defendant's objection, we must be satisfied (and the government bears the burden of showing) beyond a reasonable doubt that the erroneous instruction was harmless. In other words, "[w]e must find it highly probable that the error did not contribute to the verdict." *Coleman*, 948 A.2d at 553 (quoting *Wilson–Bey*, 903 A.2d at 844).

The record reveals that in this case, the jury focused on the aiding and abetting instruction. During its deliberations, the

---

**19.** The instruction in *Wilson–Bey* was "An aider and abettor is legally responsible for the acts of other persons that *are* natural and probable consequences *of* the crime or criminal venture in which she intentionally partici-

pates," *id.*, 903 A.2d at 826 (italics added, brackets omitted)—the italicized "are" and "of" differing from the instruction given in this case.

jury sent a note requesting "clarification from the judge on aiding and abetting in relation to the murder charge." When the trial judge responded asking for a more specific question, the jury wrote another note, asking "Do we have the option to find someone guilty of aiding and abetting only? If we believe someone is guilty of aiding and abetting, does that mean they are guilty of the murder charges?" After consulting with the parties' counsel, the judge re-read the aiding-and-abetting instructions previously given, prefaced by the following comment: "[A]iding and abetting is not a charge. Aiding and abetting is it [sic] a theory of liability that applies to the charges of first degree murder while armed, second degree murder while armed, and voluntary manslaughter while armed." The jury did not inquire further about the matter before returning its verdict three days later.

This background, appellants argue, precludes this Court from finding it highly probable that the legally erroneous "natural and probable consequences" instruction did not contribute to the guilty verdicts. As to appellant Fortson, we readily disagree. The jury found Fortson guilty of armed first-degree premeditated murder, while it found his co-defendant, Ellis, guilty of the lesser-included offense of armed second-degree murder. Since the two crimes differ only with respect to their *mens rea* elements, the disparate verdicts reveal that the jurors must have believed that only Fortson possessed the heightened *mens rea* that is an element of first-degree murder. Specifically, the jury must have found that Fortson "formed the specific intent to kill the victim for some length of time, however short, before the murderous act" and "acted with consideration and reflection upon the preconceived design to kill," while doubting whether Ellis engaged in one or both of these mental processes. *Kidd, supra,* 940 A.2d at 127

(citation omitted). More to the point, the jury must have regarded Fortson, not Ellis, as the principal (rejecting Fortson's account that "Odell" was the principal actor). This understanding of the jury's verdict is supported by the testimony and the physical evidence at trial, which provided no basis for the jury to conclude that Fortson participated in Whitfield's murder as merely an aider-and-abettor, with Ellis as the principal. Although McBeth and McClain testified that both Fortson and Ellis kicked and stomped Whitfield, McBeth specified that Fortson did "most of the jumping and stomping" and continued the attack after Ellis had left. In addition, the DNA evidence placed Fortson at the murder site but could not confirm Ellis's presence. Further, Fortson admitted participating in the attack on Whitfield, but testified that Ellis was not involved in the violence at all. "The evidence that [Fortson] played a leading role ... was overwhelming." *Wilson–Bey, supra,* 903 A.2d at 846. Under these circumstances, we see no reasonable probability that the jury convicted Fortson of first-degree murder on the basis that this heightened-*mens rea* crime was the natural and probable consequences of Fortson's having participated in Ellis's crime. *Cf. id.* at 846 (agreeing that common sense compelled agreement with the government's assessment that "[i]t is impossible to perceive how the aiding-and-abetting instruction could have harmed" appellant Wilson–Bey); *Tyree v. United States,* 942 A.2d 629, 638–39 (D.C.2008) (no reasonable construction of the evidence permitted conviction as an aider-and-abettor, as opposed to as principal).

■ Ellis's *Wilson–Bey* claim presents a somewhat closer question, because the evidence could have supported conviction on an aiding-and-abetting theory. McBeth's testimony was that Fortson was

the more active participant in the assault and that Ellis desisted from the attack before Fortson did. Further, although Whitfield's blood was found on a shirt in the driver's seat of Ellis's car, Fortson testified that he left his shirt in the car, and the other blood from Whitfield found in the car was all on the passenger's side. Thus, the evidence supported an inference that Ellis was the less bloody (or unbloodied) assailant and the lesser participant in the attack. "Accordingly, we must examine the likelihood that the jury convicted [Ellis] of second-degree murder without finding that he had the requisite *mens rea*." *Coleman, supra,* 948 A.2d at 553.[20]

■ The jury was instructed that "[s]ome affirmative conduct by the defendant to help in planning and carrying out the crime is necessary" to convict a defendant under an aiding-and-abetting theory and that "[m]ere physical presence by the defendant at the place and time this crime is committed, is not by itself sufficient to establish his guilt." In light of this instruction,[21] we reject Ellis's argument that "[t]he jury could rationally have inferred from this evidence that Ellis was present but did not strike the decedent," because— other than participating in "strik[ing] the decedent"—the evidence suggested no other affirmative conduct by which Ellis participated in the events of June 28, 2002. Rather, in convicting Ellis, the jury must have credited the testimony of McBeth or McClain (or both of them) that Ellis participated in kicking or stomping Whitfield while Fortson was likewise kicking or stomping (or stabbing). The jury did not necessarily believe that Ellis's participation lasted the thirty minutes to which McBeth testified, and did not necessarily find that Ellis participated in the most violent aspects of the attack.[22] But, in light of the undisputed physical evidence that Whitfield sustained repeated blunt

**20.** We observe, as a preface to our analysis, that reliance on an aiding and abetting theory would have permitted the jury to convict Ellis of first-degree murder, just as it did in convicting the principal Fortson of that crime. But, because second-degree murder is a lesser included offense of first-degree murder, Fortson *ipso facto* was guilty of second-degree murder as well as first-degree murder, and the jury was free to find that Ellis aided and abetted him in committing second-degree murder. This was precisely the situation we confronted in *Coleman,* where we reversed appellant Jones's conviction for second-degree murder on the ground that the jury might have relied on the erroneous aiding and abetting instruction to convict him of that crime based on his having participated in the events that led to appellant Coleman's conviction of first-degree murder. *See* 948 A.2d at 553–54. Nevertheless, the fact that the jury convicted Ellis of only the lesser-included offense provides some support for a conclusion that the jury did *not* convict him under an aiding and abetting theory, but convicted him as a principal of second-degree murder, finding that he had the *mens rea* necessary for that crime.

The fact that the jury convicted both Fortson and Ellis of *armed* murder does not necessitate an inference that one of the convictions was based on an aiding and abetting theory. The government's physical evidence included only one knife, and the evidence was consistent with only one of the assailants (the bleeding Fortson) having wielded a knife. But, in her closing argument, the prosecutor emphasized to jurors that two kinds of weapons were involved in the murder—a knife and shoes—and that they could find that appellants were armed on the basis of each having kicked, stomped or jumped on Whitfield with shod feet.

**21.** We "presume that a jury follows the court's instructions, absent any indication to the contrary." *Lewis v. United States,* 930 A.2d 1003, 1008 (D.C.2007).

**22.** As Ellis posits, jurors might have credited only a portion of McBeth's testimony and might have believed that Ellis participated in only a few minutes of the beating, leaving before Whitfield developed his most serious injuries and began to bleed.

force trauma concentrated on the head and neck while he lay defenseless on the concrete (and that he had no injuries on his extremities), the jury's finding that Ellis participated with Fortson in the attack during any portion and for any length of time of it meant, at the very least, that Ellis acted with "conscious disregard of the risk of death or serious bodily injury," *Coleman, supra,* 948 A.2d at 553, or with "wanton and willful disregard of an unreasonable human risk," *Perez, supra,* 968 A.2d at 102 (vacating first-degree murder conviction because of erroneous aiding and abetting instruction, but remanding to resentence appellant for second-degree murder, because his "intent to inflict serious bodily harm or . . . act[ ] with wanton and willful disregard of an unreasonable risk to human life" could be "inferred . . . [from] his joining in a group assault and viciously kicking" the decedent).[23] We conclude that the erroneous "natural and probable consequences" instruction was harmless beyond a reasonable doubt as to Ellis, because we see no reasonable probability that, having credited the evidence that Ellis participated with Fortson in the attack whose results Dr. Juste graphically described, the jury would have failed to convict Ellis of second-degree murder if the erroneous instruction had not been given.

## VI.

 Fortson's last challenge pertains to the testimony of government witness Paul Rangolan. Rangolan testified that while he and Fortson were incarcerated together in 2005, he heard Fortson bragging that "he had a mistrial, and one of his friends was on the jury and you know, God sent her so he could have a mistrial." Rangolan also testified that Fortson said that this juror, with whom Fortson was communicating through his wife, advised that "he had to find a way to explain to the new jurors why his blood was found at the crime scene." Fortson told Rangolan that he "would have a friend explain to the new jurors that he got a cut; that is how his blood was found at the crime scene." Rangolan further testified that, in Rangolan's presence, Fortson told fellow inmate Kevin Magnum that he wanted to have one of the witnesses in his case, Fatima [McClain], killed. According to Rangolan, Magnum (who was scheduled for imminent release from jail) replied, "I can do it."

Fortson argues that the government violated the strictures of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), when it failed to disclose certain information about Rangolan and his testimony, namely that: (1) Rangolan had been a paid informant for the FBI from 1990 to 1997; (2) that nine fake picture-identification cards were seized at the time of Rangolan's arrest in June 2004, and; (3) that one

---

**23.** *See also Ruffin v. United States,* 524 A.2d 685, 703–04 (D.C.1987) (holding that second-degree murder conviction was supported by "overwhelming" evidence where testimony showed that defendant had repeatedly "stomp[ed]" decedent, rendering decedent bloody and semiconscious); *Yates v. Evatt,* 500 U.S. 391, 409, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991) (evidence that, inter alia, defendant "attacked [complainant] by jumping on his back" was "clear evidence of [defendant's] intent to kill"), *overruled on other grounds by Estelle v. McGuire,* 502 U.S. 62, 73 n. 4, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *People v. Rabon,* No. 236009, 2003 WL 21398920, *2 (Mich.Ct.App. June 17, 2003) ("The evidence that the defendant participated in [a] prolonged [twenty to thirty minute] and brutal beating of the elderly decedent supported a finding that defendant acted in wanton and willful disregard of the likelihood that the tendency of his behavior was to cause death or great bodily harm .... the fact that decedent was alive when defendant left the residence is irrelevant").

Garvey Alston, Rangolan's cellmate, had testified before a grand jury that he had "been present in Rangolan's cell but did not hear any conversation between Fortson and Kevin Magnum regarding witnesses." [24] Fortson argues that Rangolan's testimony painted him "as a man willing to kill and without a conscience" and bolstered the government's argument that Fortson intended Whitfield's death. Fortson contends that if the information described above had been disclosed to his counsel, he likely would have "been acquitted of the first degree premeditated murder charge." [25] He raised his *Brady* argument for the first time in his Motion for New Trial following his conviction.

For there to be a true *Brady* violation, (1) "the evidence at issue must be favorable to the accused either because it is exculpatory or because it is impeaching;" (2) "that evidence must have been suppressed by the [government], either willfully or inadvertently," and; (3) "prejudice must have ensued." *Perez, supra,* 968 A.2d at 65 (quoting *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). "To satisfy the prejudice component, the withheld evidence must be material; that is, there must be a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Watson v. United States,* 940 A.2d 182, 186–87 (D.C.2008) (quoting *Strickler, supra,* 527 U.S. at 281–82, 119 S.Ct. 1936) ("there is never a real *Brady* violation unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict") (internal quotation marks and citation omitted).

The parties dispute whether the government failed to produce information in its possession that was requested by the defense. But even assuming *arguendo* this was the case, we conclude that Fortson has failed to establish the prejudice necessary for us to find an infringement of his *Brady* rights. Both Fortson's counsel and the prosecutor elicited testimony about Rangolan's considerable criminal record involving bank embezzlement, the filing of false tax returns, and weapons and drug charges, and about his hope to obtain a favorable recommendation and leniency in a pending case involving his illegal re-entry after deportation, in consideration of his testimony in Fortson's case. Any further impeachment relating to Rangolan's activity as an informant would have been "cumulative" and thus immaterial under *Brady.*[26] *Cf.*

---

**24.** Fortson asserts that in a subsequent trial on charges that he conspired to have McLain killed, Rangolan testified and was impeached with this material, and Fortson "was acquitted." The government represents that Fortson was not acquitted, but that the jury in that trial could not reach a verdict.

**25.** Fortson also contends that the government falsely represented that it would not be using a paid informant at trial. The government counters that it did not know, and had no obligation to uncover, Rangolan's history with the FBI. This court has not previously held that the FBI is a government agency "closely aligned with the prosecution" in the District of Columbia, such that the prosecution has a duty to "learn of any favorable evidence known to" that entity. *O'Brien v. United States,* 962 A.2d 282, 316 (D.C.2008).

**26.** Moreover, while a government witness's current status as a paid informant is "impeaching" insofar as it reveals the witness's bias, it is not clear that knowledge of the witness's *past* activities in this regard are at all "advantageous" to the defense. *Banks v. Dretke,* 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004); *see also United States v. Bell,* 321 Fed.Appx. 862, 863–64 (11th Cir. 2009) (no *Brady* violation where government did not disclose all information relating to witness's history as an informant); *People v. Sibadan,* 240 A.D.2d 30, 671 N.Y.S.2d 1, 5 (N.Y.App.Div.1998) ("the fact that [witness] was previously an informant for [the state]

663

*Watson, supra,* 940 A.2d at 187 (holding that result of trial would not likely have been different if defense had been aware of witness's uncharged prior bad acts). Further, as consciousness-of-guilt testimony, Rangolan's testimony was cumulative of Williams' testimony (and Fortson's own admission) about Fortson's involvement in jury tampering during his first trial.

 To the extent that Rangolan's testimony depicted Fortson as someone "willing to kill," the testimony was cumulative of the testimony and statements by McBeth, that Fortson stomped on and kicked Whitfield for over half an hour, seeking additional leverage by holding onto a fence, and persisting even after his accomplice thought the attack was "over" and left the scene. As to inmate Alston, his testimony that he did not hear a certain conversation did not negate Rangolan's testimony that the conversations occurred. *See Williams v. United States,* 881 A.2d 557, 562–63 (D.C.2005) (no *Brady* violation where government failed to disclose statements of individuals that neither corroborated nor contradicted testimony of one of its witnesses about an issue collateral to defendant's guilt). In short, we see no "reasonable probability" that disclosure of the information in issue would have caused the result of the proceeding to be different. *Watson, supra,* 940 A.2d at 188.

For the foregoing reasons, the judgments of conviction are

*Affirmed.*

does not establish any agreement or understanding that [witness] would receive any benefits for the information he provided").